**Oless BRUMFIELD, as next friend of Ervin Brumfield, et al.**

v.

**William J. DODD, Superintendent of Public Education of the State of Louisiana, et al.**

**Civ. A. No. 71-1316.**

United States District Court,
E. D. Louisiana.

Dec. 2, 1975.

George M. Strickler, Jr., New Orleans, La., for plaintiffs.

J. Stanley Pottinger, Asst. Atty. Gen., Alexander C. Ross, Thomas M. Keeling, Paul F. Hancock, Lawrence L. Newton, Dept. of Justice, Washington, D. C., Gerald J. Gallinghouse, U. S. Atty., Leonard P. Avery, Asst. U. S. Atty., New Orleans, La., for intervenors.

William J. Guste, Jr., Louisiana Atty. Gen., Warren E. Mouledoux, First Asst. Atty. Gen., William P. Curry, Jr., Asst. Atty. Gen., for defendants Louis J. Michot (substituted for William J.

Dodd), Louisiana Superintendent of Public Education; Louisiana State Board of Elementary and Secondary Education (substituted for Louisiana State Board of Education and its individual members); and Mary Evelyn Parker, Louisiana State Treasurer.

James J. Thornton, Jr., Johnston, Johnston & Thornton, Shreveport, La., for defendants Sam L. Ledbetter and Jackson Parish School Board.

Woodrow W. Erwin, Dist. Atty., Franklinton, La., for defendants Earl Brown, James Bailey and Washington Parish School Board.

Julian P. Rodrigue, Asst. Dist. Atty., Covington, La., for defendants Cyprian T. Schoen, and St. Tammany Parish School Board.

Thompson L. Clarke, Dist. Atty., St Joseph, La., for defendants Charles E. Thompson and The Tensas Parish School Board.

Hal R. Henderson, Dist. Atty., Arcadia, La., for defendants Hugh W. Whatley, Claiborne Parish School Board, M. A. Phillips and Madison Parish School Board.

Before WISDOM, Circuit Judge, HEEBE, Chief District Judge, and GORDON, District Judge.

HEEBE, Chief Judge.

This is a civil action seeking to enjoin the Louisiana State Department of Education from providing books, school material, and funds for student transportation to students attending all-white, segregated private schools in the State of Louisiana. The suit also requests that state statutes providing for such assistance to private schools be declared unconstitutional as violative of the Equal Protection Clause of the Fourteenth Amendment. Because the complaint seeks an injunction against state officials on the grounds that state statutes are unconstitutional, 28 U.S.C. § 2281, a three-judge court was convened pursuant to 28 U.S.C. § 2284 on October 14, 1971.

By agreement of the parties, the case has been submitted for decision on the basis of depositions, interrogatories and memoranda of counsel. The Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plaintiffs are black citizens of Louisiana whose minor children attend the public schools of Madison, Claiborne, Jackson, St. Tammany, Tensas, and Washington Parishes. Plaintiffs seek in their complaint to represent a class composed of all black students attending public school in the State of Louisiana and their parents.

2. At the time this suit was filed defendant William J. Dodd was the Superintendent of Public Education of the State of Louisiana, the elected head of the Louisiana State Department of Education. While the suit was pending, Mr. Dodd was succeeded in office by Louis J. Michot. The Court has allowed the substitution of defendant Michot for defendant Dodd pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

The Louisiana State Board of Education, originally made a defendant in this suit, has been replaced under Art. 8, § 3 of the Louisiana Constitution of 1974, by the State Board of Elementary and Secondary Education (hereinafter referred to as the "State Board"). The Court has allowed the substitution of the State Board for the original State Board of Education under Rule 25(d).

3. Defendant Mary Evelyn Parker is the Treasurer of the State of Louisiana.

4. Also made defendants in this action are the superintendents and school boards of the parishes in which the plaintiffs reside and in which their children attend public schools: Madison, Claiborne, Jackson, St. Tammany, Tensas and Washington Parishes.

5. Pursuant to Art. 8, § 3 of the Louisiana Constitution of 1974 and La. R.S. 17:351 and 352, the State Board controls and regulates the distribution of textbooks, library books and school

materiel to school children in the state. The mode of distribution of such books and school supplies is as follows:

Under La.R.S. 17:351, the state legislature annually determines the amount of state tax money which will be allotted for the purchase of textbooks, library books and school supplies. (Deposition of Robert Horneman, State Department of Education, Department of Textbooks and Libraries, pp. 4–5)

Based upon the previous academic year's registration of both public and private school students, the State Department of Education makes a monetary allotment to each parish school board for textbooks and school supplies. (Answer D to plaintiffs' first interrogatories to State Department of Education; Horneman Deposition, p. 5)

On or before April 1 of each year, each parish school board, through its superintendent, requisitions textbooks, library books and school supplies for the next academic year. Textbooks are selected from a catalog of state-approved textbooks and are ordered on a standard textbook order form provided by the State Department of Education. (Horneman Deposition, pp. 5–6; Deposition of Harvey V. Gardiner, Director of Textbook Depository of Louisiana State Department of Education, pp. 4–5)

Each requisition by a parish school board is based upon the requisitions of the individual schools within the parish, both public and private. (Gardiner Deposition, pp. 4–5; Horneman Deposition, pp. 5–6) The school board requisitions do not distinguish between textbooks and supplies destined for public and nonpublic schools. State Department of Education officials receive no information from parish school boards showing the number of nonpublic school students receiving state books and supplies or the dollar value of such books and supplies furnished to nonpublic school students. (Horneman Deposition, pp. 8–9)

The requisitioned textbooks are purchased by the State Department of Education and are distributed by the State Textbook Depository to the individual school boards which in turn distribute books to individual schools in the parish.

On occasion, private schools have gone directly to the State Board of Education to requisition textbooks, bypassing the parish school board. (Horneman Deposition at p. 7)

The State Department of Education has established no guidelines or standards to determine the eligibility of nonpublic school students for receipt of state books and school supplies. (Horneman Deposition, *passim*)

The dollar value of books requisitioned by any school in a given year does not reflect the value of books actually used by students in that school because books are not returned at the end of a year, but are accumulated. Accordingly, though a parish's textbook allotment may be $5.00/student/year, the value of the textbooks used by a high school student may be $25.00 or more. (Deposition of Herbert Halbach, Superintendent Madison Parish School Board, p. 11)

6. Under La.R.S. 17:158, parish school boards may provide transportation for children attending "any school" who live more than one mile from such school. The State Department of Education underwrites the cost of such transportation by allocating to each parish on an annual basis the base salary of school bus drivers employed by the parish and the operational expenses of buses operated by the parish. (Deposition of Ronald W. Carrier, State Department of Education, Director of Local School Services Systems, pp. 5–7) Parish school boards each year submit a request for transportation funds based upon the number of students in the parish eligible for transportation under La.R.S. 17:158. No distinction is made in such requests between funds requested for the trans-

portation of public and nonpublic students. (Carrier Deposition, pp. 9–10)

7. The practical effect of the distribution systems for state-owned books and school supplies and state funds for transportation is that officials of the State Department of Education have no control as to which nonpublic schools benefit from the distribution of state-owned books, supplies, and funds for transportation. The State Board of Education has no policy of prohibiting the distribution of state books and school supplies to racially segregated private schools, nor does any policy of the State Board prohibit the use of state transportation funds for the benefit of students attending such segregated schools. (Carrier Deposition, pp. 18–19; Horneman Deposition, *passim*)

8. Prior to the 1969–70 school year, public school boards throughout the State of Louisiana, including defendant local school boards, operated dual racially segregated systems of pupil assignment. In most cases, black students who attended formerly all-white schools did so under the exercise of "freedom of choice" options under court orders. No white students were assigned to previously all-black schools. The large majority of black students attended traditionally segregated all-black schools. During 1969 and 1970, as a result of decisions of the United States Supreme Court, federal district courts ordered most Louisiana school boards, including the defendant boards, to assign students and faculty to their schools on a racially nondiscriminatory basis and in particular to eliminate or integrate all-black schools.

9. Coinciding with these orders requiring massive integration, and as direct result thereof, numerous segregated, private schools were organized in order to allow white students to avoid court-ordered integration, *infra*. These schools, and other existing private schools, served as an escape valve for white students unwilling to attend fully integrated public schools. In many parishes the flight of white students to the private schools significantly reduced the enrollment of white students in the public school system, thus undermining the effectiveness of the court orders.

10. These private schools have been and are materially assisted by the State Department of Education and by local school boards inasmuch as they have received state-owned textbooks, library books, school materiel, and in some cases have benefited by transportation of their students by public school buses.

11. *Washington Parish*

In the summer of 1969 this Court ordered the Washington Parish School Board to completely integrate its schools. (*Moses v. Washington Parish School Board, No. 15973*) In September of 1969 the Bowling Green Academy in Franklinton, Louisiana, began operation. Bowling Green was and is a private, coeducational, racially segregated school encompassing grades 1–12. In its first year of operation Bowling Green enrolled 256 white students. (State Department of Education Annual Report 1969–70, Table 17, p. 253) The enrollment of the school has risen each year during its operation, and it currently enrolls approximately 356 white students. (State Department of Education Annual Report 1972–73, Table 17, p. 125) No black student has ever attended Bowling Green, nor has the school ever employed a black faculty member.

Prior to September 1969, there had been no private school of any kind operating in Washington Parish. The Bowling Green school was opened in direct response to this Court's order of integration. During the 1968–69 school year, 3,195 white students were enrolled in the Washington Parish public schools. (State Department of Education Annual Report 1968–69, Table 17, p. 213) In the 1969–70 school year white enrollment declined to 2,602 (State Department of Education Annual Report 1969–70, Table 17, p. 211), a reduction

of 18½%. The large majority of students who left the Washington Parish public schools enrolled in Bowling Green or in private segregated schools in other parishes.

Since its inception, the Bowling Green School has requisitioned textbooks from the Washington Parish School Board in exactly the same manner as public schools in Washington Parish. The Washington Parish School Board requisitioned textbooks from the State Department of Education and provided those books to the Bowling Green School.

Bowling Green students were picked up by public school buses operated by the Washington Parish School Board with State Department of Education funds, and transported to the Bowling Green School.

The providing of textbooks and free transportation to students attending the Bowling Green School constituted significant material assistance to that school by the Washington Parish School Board and by the State Department of Education.

In November 1974 the plaintiffs in the original school desegregation suit filed a motion in that action (*Moses v. Washington Parish School Board, supra*) requesting this Court to prohibit any further assistance to the Bowling Green School by the Washington Parish School Board. On December 11, 1974, after full evidentiary hearing, this Court ordered the School Board to stop providing transportation to students attending the Bowling Green School at the end of the first school semester of the 1974–75 school year, to provide no further textbooks or other school materiel to the Bowling Green School, and to retrieve from the school all state-owned textbooks provided to that school during its operation at the end of the 1974–75 school year. (*Moses v. Washington Parish School Board, No. 15973,* December 11, 1974)

## 12. St. Tammany Parish

The first significant integration of the St. Tammany Parish schools under court order occurred in the 1968–69 school year. (*Smith v. St. Tammany Parish School Board, No. 15463*) The River Forest Academy was founded in 1968 as a private, segregated, coeducational school enrolling grades 1–12. Prior to 1968, there were a number of parochial schools in St. Tammany with a significant enrollment. In 1968–69, 2,690 white students and 41 blacks were enrolled in private schools in the parish (State Department of Education Annual Report, Table 16, pp. 243, 252). Prior to 1968, however, there were no secular private schools in the parish. The River Forest Academy was opened as a direct result of court-ordered integration of the public school system. The school initially enrolled 184 students (State Department of Education School Directory, 1969–70, p. 251). In 1969 the enrollment of the school climbed to 212, where it has remained.

In 1969, the first year for full integration in the parish, the white enrollment of all private schools in the parish increased from 2,690 to 3,183 (State Department of Education Annual Report, Table 17, p. 253), while the white public school enrollment actually declined (from 11,667 in 1968–69 to 11,528 in 1969–70). The relatively small absolute decline in white students is misleading in itself, because white enrollment in the public schools had been increasing rapidly up to that time (from 1,473 in 1965–66 to 11,667 in 1968–69) (State Department of Education Annual Reports 1968–69, Table 17, p. 213, 1969–70, Table 17, p. 221; Deposition of Cypriot Schoen, Superintendent, St. Tammany Parish School Board).

During its first year of operation River Forest requisitioned textbooks from the St. Tammany Parish School Board in exactly the same manner as such books were requisitioned by public schools and all parochial schools in the

parish. Approximately one year later the textbook supervisor for the school board interpreted the district court integration order as not allowing the school board to assist private segregated schools. The textbook supervisor wrote a letter to each private and parochial school receiving textbooks requesting that they submit statements of their admissions policy as a prerequisite for receipt of further textbooks. River Forest did not send in such a statement of compliance and has received no textbooks from that date. All parochial schools in the parish did submit statements of compliance and have continued receiving textbooks. In 1972–73* all private schools in the parish enrolled 2,929 white students and 44 black students (State Department of Education Annual Report, Table 17, pp. 125–130).

The River Forest Academy operates its own buses and students attending that school have not ridden on public school buses. Parochial school students do ride on parish buses.

### 13. *Tensas Parish*

The Tensas Parish School Board came under a court order requiring full integration effective during the 1970–71 school year. During that same year, the Tensas Academy was organized. Tensas Academy is a private school owned by a Louisiana corporation called Tensas Academy, Inc. It initially enrolled 359 white students (Louisiana School Directory 1971–72, p. 282). The school presently enrolls 344 white students. There has never been a black student enrolled in the Tensas Academy, nor has any black faculty member been employed there. There is no academic standard or test as a prerequisite for admission to the academy, but the board of directors of the academy must approve each admission. No applicant for admission has ever been rejected. (Deposition of Jackie Bower Nickelson, Superintendent, Tensas Academy, pp. 3–5) Prior to the opening of Tensas Academy there was

no private school Tensas Parish. The Tensas Academy was created as a direct response to the court-ordered integration of the public schools of Tensas Parish and its enrollment consisted in large part of white students who left the public school system as a result of racial integration. (Deposition of Charles Edward Thompson, Superintendent, Tensas Parish School Board, pp. 2 and 7) The white enrollment in Tensas Parish public schools declined from 1,076 in 1969–70 (State Department of Education Annual Report, Table 16, p. 220) to 574 in 1970–71 (State Department of Education Annual Report, Table 16, p. 215), a decrease of 46.6%. In 1972–73 the white enrollment in the public schools was 463 (State Department of Education Annual Report 1972–73, Table 16, p. 109).

From its inception the Tensas Academy has requisitioned state-owned textbooks through the Tensas Parish School Board in exactly the same manner as public schools in that parish. The requisition of the Tensas Academy is included in the overall requisition of the school board which is compiled from all the individual school requests. (Thompson Deposition, pp. 4–5)

The Tensas Academy operates its own school buses and no transportation has been furnished to students attending that school by the parish school board. When the academy was formed, white football players transferring to the academy were allowed to take their uniforms with them. (Thompson Deposition, p. 6)

### 14. *Claiborne Parish*

The Claiborne Parish School Board came under court order requiring full integration of the public schools prior to the 1969–70 school year. In the summer of 1969 the Claiborne Academy Foundation (a Louisiana corporation) was formed. In the 1969–70 school year, two private schools were in operation in the parish, the Haynesville

---

* The last year for which an Annual Report has been published.

Academy and the Homer Academy. The Homer Academy was owned by the Foundation. Together the two schools enrolled 440 students (Louisiana School Directory 1970–71, p. 240; Deposition of J. R. Kilgore, Principal of Claiborne Academy, pp. 2–3). Prior to the 1970–71 school year, the two private schools were merged into the Claiborne Academy, which presently enrolls approximately 500 students. (Kilgore Deposition, p. 5) Neither the Claiborne Academy nor its predecessors has ever enrolled a black student nor has any black faculty member been employed. Prior to the opening of the Haynesville Academy and the Homer Academy there had been no private schools in the parish. The Claiborne Academy has no fixed admission standards and only one student has ever been refused admission for academic reasons. Each applicant for admission must be approved by the all-white board of directors of the school. The Claiborne Academy and its predecessors were formed as a direct response to the court-ordered integration of the public schools of the parish. The white students attending the Claiborne Academy formerly attended the public schools of the parish and left because of their racial integration. In the 1968–69 school year, prior to the opening of the private schools, the white enrollment of the public schools was 1,853 (Department of Education Annual Report 1968–69, Table 17, p. 212). In 1969–70 the white enrollment was 1,593, a decrease of 14%. (State Department of Education Annual Report 1969–70, Table 17, p. 220) The white enrollment in the public schools has steadily declined (1,062 in 1972–73, State Department of Education Annual Report, Table 16, p. 109), while the Claiborne Academy's enrollment has grown.

Since its inception, the Claiborne Academy and its predecessors received state-owned textbooks requisitioned through the Claiborne Parish public schools. Books were requisitioned by the academy through the public school board in exactly the same manner as public schools within the parish requisitioned books. (Deposition of W. T. Bailey, Superintendent of Schools, Claiborne Parish, pp. 5–7) The academy also has requisitioned on a regular basis library books and school supplies. (Bailey Deposition, pp. 7–8)

In the past the Claiborne Academy has on occasion been loaned educational equipment owned by the parish school board and during its first year of operation the academy used the football stadium owned by the parish school board (Bailey Deposition, pp. 8–9). The Claiborne Academy owns its own school buses, and no academy students are transported on parish-owned buses. (Bailey Deposition, pp. 3–4)

15. *Jackson Parish*

The Jackson Parish public school system came under full court-ordered integration prior to the beginning of the 1969–70 school year. In that same school year two private schools began operation in the parish, Eros Christian Academy and Jonesboro-Hodge Christian Academy. The schools enrolled a combined total of 292 white students in their first year of operation. (Louisiana School Directory 1970–71, Table 17, p. 243) The following year, 1970–71, the schools enrolled a combined total of 300 students, but in the years thereafter the enrollment in both schools declined drastically, and both schools ceased to exist sometime during the 1972–73 school year. Both the Eros Academy and the Jonesboro-Hodge School were formed as a direct response to court-ordered integration in the parish, and their formation interfered with the effective integration of the parish schools. In the 1968–69 school year, prior to the formation of the private schools, the overall white enrollment in the Jackson Parish public schools was 2,291 (Louisiana State Department of Education Annual Report, Table 17, p. 212). In the 1969–70 school year overall white enrollment in the school system fell to 1,984, a decrease of 13% (Louisiana State Department of Education Annual Report 1970, Table 17, p. 220).

From their inception the private schools in Jackson Parish requisitioned state-owned textbooks through the Jackson Parish School Board in exactly the same manner as such books were requisitioned by the public schools in the parish. No distinction was made between requisitions submitted by the private schools and the public schools. The basis of the allotment of textbooks to the private schools was exactly the same as the basis of the allotment to the public schools.

Both private schools in the parish operated their own buses and no transportation was provided to private school students on parish-operated buses.

### 16. *Madison Parish*

The Madison Parish public school system came under full court-ordered integration effective during the 1969–70 school year. In the 1968–69 school year a private school called the Delta Christian Academy began operation enrolling grades 1–8. The Delta Christian Academy was owned by the Delta Christian School, Inc., a Louisiana corporation formed in 1967. During its first year of operation (1968–69) the Delta Christian Academy enrolled 198 white students. (State Department of Education School Directory 1969–70, p. 240) In the 1969–70 school year, the Tallulah Academy was organized as the high school extension of the Delta Christian Academy. The Tallulah Academy is also owned by Delta Christian School, Inc. In that year the combined enrollment of the Delta Christian Academy and Tallulah Academy was 238 white students. (State Department of Education School Directory 1970–71, p. 248) In the 1970–71 school year the combined enrollment of the schools was 462. The combined enrollment of the schools at present is 476 white students. (Louisiana School Directories 1970–71, 1973–74) Neither the Delta Christian Academy nor the Tallulah Academy has ever enrolled a black student, nor has any black faculty member been employed. The schools have no stated academic admissions requirements although the school does "reserve the right to accept only those students it desires." (Deposition of Russell G. Peterson, Executive Board, Tallulah Academy, pp. 5–6) No student has ever been denied admission to the school for academic reasons. The Delta Christian School and the Tallulah Academy were organized as a direct response to the court-ordered integration of the parish's public schools. The white students attending the academies left the public school system as a result of the racial integration of such system. The operation of the academies has significantly interfered with the integration of the public schools of the parish. In the 1968–69 school year the overall white enrollment in the Madison Parish public schools was 1,220. (State Department of Education Annual Report, Table 17, p. 213) In the 1969–70 school year the total white enrollment in the parish public schools fell to 391, a decrease of 68% (State Department of Education Annual Report 1969–70, Table 17, p. 220).

From their inception the private academies in Madison Parish received state-owned textbooks which were requisitioned by the Madison Parish School Board in exactly the same manner as books were requisitioned by the public schools in that parish. (Deposition of Herbert Boone Halbach, Superintendent, Madison Parish School Board, pp. 6–7) The academies requisition books on the same allotment basis as books are provided to the public schools in the parish.

The academies operate their own buses; however, academy students are allowed to ride public school buses when they so desire. Halbach Deposition at 4–5. During its first year of operation, the Tallulah Academy rented the public school football stadium.

17. In 1970, at the height of the private school growth, the Louisiana Independent School Association (LISA) was formed for the "independent" (*i. e.*, non-parochial) private schools. The or-

ganization originally had 20 member schools. It currently has 57 members (Deposition of Rex Pearce, Executive Secretary of LISA, pp. 5–8). Among its members are the Bowling Green School of Washington Parish, the Tensas Academy of Tensas Parish, the Tallulah Academy of Madison Parish, and the Claiborne Academy of Claiborne Parish (LISA Directory of 1974–75, attached as Pl. # 3 to Pearce Deposition). The LISA's Executive Secretary does not know of any member school which is racially integrated (Pearce Deposition at 11–12). The LISA operates its own athletic conference in which only LISA members may compete (Deposition of Pearce at 12–14), thus insuring that no member will be forced to compete against an integrated school. Indeed, LISA members are not *allowed* by the rules of the conference to compete against non-member schools. (Pearce Deposition at 14)

18. The school desegregation history and related private school growth outlined for the six parishes directly involved in this suit is typical of parishes throughout this state. The Court finds it likely that a large number of private, segregated schools created for the specific purpose of avoiding racial integration of the public schools have in the past and continue in the present to receive significant assistance in the form of textbooks, library books and free transportation from the Louisiana State Department of Education and local parish school boards.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this cause. 28 U.S.C. § 1343(3) and (4). A three-judge district court was properly convened to hear plaintiffs' claim for injunctive relief against the unconstitutional application of La.R.S. 17:158, 17:351–52 in violation of plaintiffs' rights under the Fourteenth Amendment to the United States Constitution. 28 U.S.C. §§ 2281, 2284; *White v. Register*, 412 U.S. 755, 93 S.Ct. 2342,

37 L.Ed.2d 314 (1973); *Goosby v. Osser*, 409 U.S. 512, 93 S.Ct. 854, 35 L.Ed. 2d 36 (1973), *see generally* 1A (Part 2) G. Moore, Federal Practice ¶ 0.205 (2d ed. 1974).

2. Defendants, Charles E. Thompson (Superintendent of Schools, Tensas Parish), the Tensas Parish School Board, Hugh W. Whatley (Superintendent of Schools, Claiborne Parish), the Claiborne Parish School Board, M. A. Phillips (Superintendent of Schools, Madison Parish), and the Madison Parish School Board move to dismiss the complaint because it fails to state a claim upon which relief can be granted and because the Court lacks jurisdiction. Alternatively, they move for a change of venue pursuant to 28 U.S.C. § 1404. Defendants' motions are denied.

3. Venue is properly laid in the Eastern District of Louisiana because this is a non-local action against defendants residing in different districts within the same state and different divisions of the same district, which 28 U.S.C. §§ 1392(a) and 1393(b) declare may be brought in any district or division where any defendant resides. *See, also,* 1 G. Moore, Federal Practice ¶ 0.142[2.-1] p. 1456 and ¶ 0.143[1] p. 1552.

4. The motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted is denied because the plaintiffs have asserted a cause of action for which the Court can fashion relief. Specifically, the plaintiffs' alleged deprivations of Fourteenth Amendment rights are capable of redress under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202.

5. This action may be maintained as a class action. *Norwood v. Harrison*, 413 U.S. 455, 457, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973); C. Wright & A. Miller, Federal Practice and Procedure § 1776 n. 65 (1972).

6. The state of Louisiana is obligated to make available to all children

**348**

school textbooks, library books, and school supplies and materials. Art. 8, § 13(A) Louisiana Constitution of 1974, La.R.S. 17:351, 352.

7. Parish and city school boards in Louisiana may provide transportation for students attending any school approved by the State Board. La.R.S. 17:158.

8. Mary Evelyn Parker, as Treasurer of the State of Louisiana, pays state funds to persons authorized to receive them, including the disbursement of state funds to parish and city school boards. La.R.S. 49:309 and 312; La. R.S. 17:14.

9. Superintendent of Schools Louis J. Michot, as State Superintendent of Education, and persons under his control, are charged with the responsibility of disbursing textbooks, school supplies and materials, and otherwise manage the State's educational system. La.R.S. 17:6.

10. The State Board of Elementary and Secondary Education is a corporate body created by Art. 8, § 3 Louisiana Constitution of 1974. The State Board has general control and authority over the elementary and secondary educational system of the State of Louisiana, and in particular regulates the distribution of textbooks to parish and city school boards. Art. 8, § 3(a) Louisiana Constitution of 1974, La.R.S. 17:7; *Borden v. Louisiana State Board of Education,* 168 La. 1005, 123 So. 655 (1929). The State Board implements its policies through the State Superintendent of Education and the State Department of Education, *Id.*

11. The State Board has the authority to exercise administrative control and supervision over the adoption, distribution and use of school textbooks and to adopt necessary rules and regulations governing their use. La.R.S. 17:7.

12. The Louisiana State Superintendent of Education has the duty to direct the parish and city superintendents to make the distribution of school text-

books to public and private schools. Opinion of La.Atty.Gen., Oct. 10, 1969.

13. Washington Parish School Board, St. Tammany Parish School Board, Jackson Parish School Board, Claiborne Parish School Board, Madison Parish School Board and Tensas Parish School Board are public corporate bodies established under La.R.S. 17:51 and charged with administering the public schools of their respective parishes.

14. Defendant Louisiana State Superintendent of Education, defendant Louisiana State Department of Education, and defendant parish school boards, by furnishing school textbooks, school supplies and educational materials, library books, and by providing school bus transportation to students attending private, racially segregated schools which serve as a haven to those leaving racially integrated public schools are in violation of rights vested in plaintiffs and their class by the Fourteenth Amendment to the United States Constitution. *Norwood v. Harrison,* 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973); *Graham v. Evangeline Parish School Board,* 484 F.2d 649 (5th Cir. 1973).

15. Because La.R.S. 17:351, 352 and 158 are implemented by defendants so as to allow substantial state assistance to racially segregated private schools, the statutes run afoul of the equal protection clause of the Fourteenth Amendment and are thus unconstitutional as applied. *Norwood v. Harrison, supra.* Accordingly, the defendants must be enjoined from providing textbooks, library books, other school material and transportation on publicly subsidized school buses to private, racially segregated schools and/or to students attending such schools.

16. Defendants are obliged to recoup from private schools which discriminate on the basis of race all textbooks, library books, school supplies and materials which these private schools have received from state or local educational officials. *Wright v. Baker County Board*

*of Education*, 501 F.2d 131 (5th Cir. 1974); *United States v. Mississippi*, 499 F.2d 425 (5th Cir. 1974) (en banc); *Norwood v. Harrison*, 382 F.Supp. 921 (N.D.Miss.1974); *Moses v. Washington Parish School Board, No. 15973*, Dec. 11, 1974.

## ORDER

On August 18, 1975, the above-styled case was submitted to this Court for decision. After giving careful consideration to the depositions, answers to interrogatories, exhibits, and stipulations which comprise the record in this cause, the Court believes that the following relief is necessary to meet the requirements of federal law.

It is hereby ordered,

1. The defendants, and their agents, are permanently enjoined from distributing or otherwise making available textbooks, library books, transportation, school supplies, equipment, and any other type of assistance, or funds for such assistance, to any racially discriminatory private school or to any racially segregated private school.

2. The defendants shall forthwith implement the following certification procedure in order to determine the eligibility of private schools in Louisiana to receive state assistance.

a. Within one week defendants shall send to each private school in Louisiana which has in the past received and/or is presently receiving, state textbooks, transportation services, or any other type of assistance, a copy of this order and the "Certification and Background Information Form" which is appended hereto.

b. The defendants shall require each private school to complete, under oath of an authorized representative of the private school, the "Certification and Background Information Form" and return it to the State Board of Elementary and Secondary Education within two weeks.

The defendants shall advise each private school that the failure to complete this Form will render the school ineligible to receive state assistance.

c. As soon as practicable, but no later than seven weeks from the entry of this order, the defendants shall determine the eligibility of all private schools to receive state assistance.

d. The defendants shall promptly notify each private school as to whether it is eligible to receive state assistance and shall concurrently file with the Clerk of this Court and serve upon counsel for the plaintiffs and plaintiff-intervenors a report, containing the eligibility determination, the "Certification and Background Information Form", and any other supporting evidence. The report will also contain a list of all private schools which were sent the "Certification and Background Information Form" and note all private schools which chose not to complete the Form. Within two weeks after receipt thereof, any party aggrieved by the final administrative decision of the defendants, including the parties to the cause as well as any adversely affected private school, may seek judicial review by filing in this Court objections to the certification of eligibility or denial thereof.

3. For any private schools which are found to be racially discriminatory by the defendants, or by this Court on challenge, and for any private schools which have received aid in the past but do not apply for aid under the aforementioned procedure, the defendants and their agents are ordered to give a complete accounting of all public aid which they have provided to the segregated private schools since June 1968. Such an accounting will be filed with this Court and served on all parties, and will show, among other things, the number and cost of all textbooks, library books, school supplies, or other tangible materials which have been provided to the private school, or its students, at public expense, and the date which such materials were provided. It will also give a year-

by-year statement of all services, such as transportation, which have been provided, and the value of such services and state the basis on which the value of such services was calculated.

4. From all private schools which are found to be racially discriminatory or found to have received aid in the past but do not apply for aid under the aforementioned procedure, the defendants are ordered to collect, within ten weeks of the entry of this order, any and all state-provided textbooks, library books, school supplies or other tangible materials, in the possession of said schools or in the possession of the students attending said schools. The defendants shall certify to the Court, with copy to counsel, a list of all such materials returned, the date said materials were returned and the name of the school which returned the materials. Notwithstanding the foregoing, any private school which may challenge the decision of ineligibility by the defendants and which has filed a timely request for judicial review in the manner hereinabove provided may apply to this Court for an extension of the delivery date upon the showing of good cause therefor.

The Court retains continuing jurisdiction of this cause for the purpose of issuing such further and supplemental orders as may be necessary to effectuate the intent of the foregoing.

## LOUISIANA BOARD OF ELEMENTARY AND SECONDARY EDUCATION CERTIFICATION AND BACKGROUND INFORMATION FORM

This form must be completed and submitted to Louis J. Michot, Louisiana Board of Elementary and Secondary Education within two weeks by any private school which wishes to qualify for receipt of state textbooks, library books and school supplies under La.R.S. 17:352 and/or which wishes to qualify its students for transportation on public school buses.

1. NAME OF PRIVATE SCHOOL: ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

2. ADDRESS (include parish): ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

3. NAME AND TITLE OF OFFICIAL COMPLETING FORM: ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

4. GRADES PRESENTLY SERVED BY SCHOOL: ⎯⎯⎯⎯⎯⎯

5. DATE PRIVATE SCHOOL OPENED FOR THE FIRST TIME AND GRADES SERVED UPON OPENING: ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

6. DATE ADDITIONAL GRADES WERE ADDED (if any): ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

7. ENROLLMENT AND FACULTY BY RACE:

| | Students | | Professional Staff | |
|---|---|---|---|---|
| | White | Black | White | Black |
| September 1968 | ⎯⎯⎯ | ⎯⎯⎯ | ⎯⎯⎯ | ⎯⎯⎯ |
| September 1969 | ⎯⎯⎯ | ⎯⎯⎯ | ⎯⎯⎯ | ⎯⎯⎯ |
| September 1970 | ⎯⎯⎯ | ⎯⎯⎯ | ⎯⎯⎯ | ⎯⎯⎯ |
| September 1971 | ⎯⎯⎯ | ⎯⎯⎯ | ⎯⎯⎯ | ⎯⎯⎯ |

7. ENROLLMENT AND FACULTY BY RACE:—Continued

|  | Students | | Professional Staff | |
| --- | --- | --- | --- | --- |
|  | White | Black | White | Black |
| September 1972 | _____ | _____ | _____ | _____ |
| September 1973 | _____ | _____ | _____ | _____ |
| September 1974 | _____ | _____ | _____ | _____ |
| September 1975 | _____ | _____ | _____ | _____ |

8. a. STATE WHETHER STUDENTS ATTENDING SCHOOL ARE IDENTIFIED BY RELIGION BY SCHOOL RECORDS: _____

   b. If yes, state the religion catered to by the school: _____

   c. If yes, state the number of faculty members, by religion, employed by the school in September 1974: _____

9. IS THE SCHOOL PRESENTLY RECOGNIZED AS EXEMPT FROM FEDERAL INCOME TAXES?               YES ___   NO ___

   If yes, state the date on which said exemption was approved or granted: _____

10. DOES THE SCHOOL MAINTAIN EDUCATIONAL STANDARDS ESTABLISHED BY THE STATE DEPARTMENT OF EDUCATION? _____

11. ARE SCHOLARSHIPS (ACADEMIC OR ATHLETIC) AVAILABLE AT YOUR SCHOOL? _____
    If yes, state the number of such scholarships offered during the 1972–73 school year to: a) white students _____; and b) black students _____

12. ARE SCHOLARSHIPS AWARDED BY PRIVATE INDIVIDUALS TO STUDENTS OF YOUR SCHOOL? YES ___   NO ___
    If yes, state the number of students by race who obtained such scholarship assistance during the 1972–73, 1973–74, and 1974–75 school years.   a) black students _____; b) white students _____

13. a. WHAT IS THE TUITION OF THE SCHOOL?
       One student in family _____
       Two students in family _____
       Three or more students in family _____

    b. HAS ANY TUITION DUE THE SCHOOL BEEN WAIVED? If yes, then state the number of students, by race, granted such waiver during the 1972–73, 1973–74, and 1974–75 school years: a) white students _____; b) black students _____

14. IS THE SCHOOL A MEMBER OF THE LOUISIANA INDEPENDENT SCHOOL ASSOCIATION (LISA)? _____
    If not, state any other organization the school is a member of:

15. a. ARE ANY BLACK STUDENTS ENROLLED AT YOUR SCHOOL MEMBERS OF ANY ATHLETIC TEAM(S) SPONSORED BY YOUR SCHOOL? _____

   b. DOES ANY ATHLETIC TEAM(S) SPONSORED BY YOUR SCHOOL COMPETE AGAINST TEAMS FROM OTHER SCHOOLS WHICH ARE RACIALLY INTEGRATED?

   _____

   If yes, state the names and location of all such schools that had integrated teams in the 1972–73, 1973–74, 1974–75 school year: _____

   _____

   _____

   _____

16. a. DOES THE SCHOOL HAVE A WRITTEN AFFIRMATIVE POLICY OF ADMITTING STUDENTS IRRESPECTIVE OF RACE? _____
   If yes, attach a copy of that policy and state the date of its

   _____

   adoption by the governing board of the school.

   b. Has the school publicized this policy in a manner that is intended to and has been reasonably effective in bringing it to the attention of persons of student age (and their families) who are of minority groups, including all non-whites? _____.
   If yes, attach copies of all notices in all newspapers, brochures, catalogues or printed advertisements appearing or prepared at the time the school was first opened and during the past school year.

   c. Has any member of the school's governing board, administrators or faculty taken any action or made any statement qualifying or negating the school's stated policy of open admissions? _____

17. STATE THE NAMES AND ADDRESSES AND RACE OF THE SCHOOL'S:

   a) Incorporators:

   _____

   _____

   _____

   _____

   b) Founders:

   _____

   _____

   _____

   _____

17. STATE THE NAMES AND ADDRESSES AND RACE OF THE SCHOOL'S:—Continued

c) Board Members:

_____

_____

_____

_____

18. STATE THE NAMES OF INDIVIDUALS, CORPORATIONS OR ORGANIZATIONS WHO (WHICH) HAVE CONTRIBUTED LAND OR BUILDINGS TO THE SCHOOL SINCE JUNE 1968:

_____

_____

_____

19. STATE WHETHER ANY INDIVIDUAL, CORPORATION OR ORGANIZATION LISTED IN ANSWER TO 17 AND 18 HAS ATTEMPTED TO INFLUENCE THE SCHOOL TO MAINTAIN RACIALLY SEGREGATED EDUCATIONAL PROGRAMS SINCE JUNE 1968:

_____

If yes, state the name of such individual, corporation or organization: _____

_____

20. STATE WHETHER ANY INDIVIDUAL, CORPORATION OR ORGANIZATION LISTED IN ANSWER TO 17 AND 18 HAS ATTEMPTED TO INFLUENCE THE SCHOOL TO INCREASE ITS ENROLLMENT AND/OR TO LOWER ADMISSION STANDARDS TO ACCOMMODATE WHITE STUDENTS LEAVING PUBLIC SCHOOLS BECAUSE OF RACIAL INTEGRATION.

_____

If yes, state the name of such individual corporation, or organization.

_____

_____

21. STATE WHETHER ANY BOARD MEMBER, OFFICER OR ADMINISTRATOR OF THE SCHOOL IS PRESENTLY A MEMBER OF ANY ORGANIZATION ESPOUSING OR ADVOCATING WHITE RACIAL SUPREMACY OR SUPERIORITY.

_____

If yes, list such individual(s):

_____

_____

_____

I hereby swear (or affirm), under penalties of perjury, that the foregoing information is true and accurate to the best of my knowledge,

information and belief. I further understand that this affidavit is executed as a condition precedent to the State of Louisiana furnishing textbooks, funds, or other material assistance to the above-named private school and/or for qualifying students attending the school to ride on public school buses, and that full and accurate answers are required by order of the United States District Court for the Eastern District of Louisiana dated _____, 1975, in Civil Action No. 71–1316 styled *Brumfield, et al. v. Dodd, et al.*, on the docket of the court.

This _____ day of _____, 197__.

SWORN TO and subscribed before me this _____ day of _____, 197__.

Title: _____

_____
Notary Public
My Commission Expires:

(Name of School)

_____

(Seal)