United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 6, 2004**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT

————————————————

No. 03-30627

————————————————

VERTREES MOSES, by his father and next friend Wilton Moses
and all other Negroes similarly situated; MILDRED JENKINS;
MCKESIA THOMAS; NORMA BICKHAM; DONNIE BRUMBLIELD;
UNITED STATES OF AMERICA,

Plaintiffs-Appellees,

versus

WASHINGTON PARISH SCHOOL BOARD, a Corporation;
RICHARD N. THOMAS, President;
DENNIE FOWLER, Superintendent,
Franklinton, Louisiana,

Defendants-Appellees,

versus

BOWLING GREEN SCHOOL,

Intervenor-Appellant.

———————————————————————————————————————————————

Appeal from the United States District Court
for the Eastern District of Louisiana

———————————————————————————————————————————————

Before SMITH, BENAVIDES, and PICKERING, Circuit Judges.

PICKERING, Circuit Judge.

This case demonstrates the progress we have made, yet the distance we have to go to

eliminate the vestiges of past racial discrimination.

PROCEDURAL BACKGROUND

This lawsuit was first filed in 1965, resulting in the Washington Parish Public Schools

being integrated in 1969. Simultaneously with the integration of the schools, Bowling Green

School was organized as a private racially segregated school. Louisiana apparently has a long history of providing aid in the form of textbooks, library books, supplies, equipment and transportation to students in private schools. In 1974, plaintiffs in this case alleged that Washington Parish Public School District had unconstitutionally provided considerable aid to Bowling Green School in the form of equipment, furniture and books. After a hearing the trial court found "[i]t is obvious to the Court that the effect of the aforementioned aid to this private racially segregated school constitutes a public encouragement of private discrimination which has the effect of diluting and frustrating our efforts to integrate this public school system in Washington Parish." R. 5: 1349.[1] The court then enjoined Washington Parish School Board from "providing school textbooks. . . other materials and equipment. . . transportation. . . and providing any other assistance to the Bowling Green School. . ." *Id.* at 1351.

In 1975 a separate lawsuit, *Brumfield v. Dodd*, 405 F.Supp. 338 (E.D. La. 1975), was filed with some or all of the plaintiffs in the instant litigation, along with others bringing suit against certain state officials, the Louisiana State Board of Elementary and Secondary Education (BESE) and six Louisiana parishes, including Washington Parish. This was a class action against the State and these six parish school districts. The *Brumfield* court was a three judge panel within the same district as the case at bar. The order entered in *Brumfield* applied to all defendants, and enjoined the state defendants and the six parish school districts from "distributing or otherwise making available textbooks, library books, transportation, school supplies, equipment, and any other type of assistance, or funds for such assistance, to any racially discriminatory private school or to any racially segregated private school." *Brumfield*, 405 F.Supp. at 349. The acts enjoined

---

[1]This opinion will refer to the Record on Appeal in this case as R. Volume: Page.

by the *Brumfield* court in 1975 were basically the same acts that were enjoined by the court in this case in 1974. However, the court in *Brumfield* created a mechanism for BESE to certify that private schools were no longer racially discriminatory and thus make them eligible for state assistance. *See Brumfield*, 405 F.Supp. at 349-54.

From 1974 until 1999 Bowling Green made no effort to become *Brumfield* certified. Louisiana for some time has had a scholarship program called the Tuition Opportunity Program for Students (TOPS) providing college scholarships for students graduating from high school with a B average or better. In the spring of 1999, the Louisiana Legislature amended the TOPS program to require that "any student requesting an award of TOPS money had to be enrolled in a school that was eligible for such grants and be in effect a *Brumfield v. Dodd* certified school." R. 8: 41.

In July of 1999, Bowling Green for the first time applied for *Brumfield v. Dodd* certification. Although BESE submitted Bowling Green's application to the Justice Department, the Justice Department objected to Bowling Green's application noting that Bowling Green had no African American students and indicating Bowling Green would have to offer "substantial and credible evidence of objective acts and declarations showing that the absence of Blacks was not proximately caused by the school's policies and practices"[2] to be eligible for certification. Bowling Green was not certified at that time.

However, in December 2001 after enrolling an African American student, Lee Adams, Jr., Bowling Green received *Brumfield* certification. Bowling Green thereafter requested available public assistance through the Washington Parish School Board. Washington Parish School Board

---

[2]Plaintiff's Exhibit 5, April 24, 2003, hearing.

denied Bowling Green's request because of the injunction entered in this case in 1974. In September 2003 Bowling Green moved, and was allowed, to intervene in this case, and petitioned the court to lift or modify the injunction.

## THE DISTRICT COURT'S RULING

The district court conducted an evidentiary hearing in this matter in April 2003, and on June 4, 2003, conducted a second hearing and ruled from the bench that *Brumfield* certification did not as a matter of law modify the injunction rendered in this case in 1974, that *Brumfield* certification alone was not reason to dissolve or modify the injunction, but that *Brumfield* certification was a matter to be taken into consideration. The court found that it had to "determine whether Bowling Green has demonstrated a good-faith commitment to eliminate vestiges of past discrimination and [made] meaningful progress toward becoming a fully integrated, non-discriminatory school with respect to faculty, extra-curricular and all other facets of the operation." R. 8: 4. The court concluded that because Bowling Green failed to integrate its school from 1974 until 1999, and ultimately integrated only because its students would have otherwise ceased to be eligible for the TOPS programs, and in view of the fact that the school did not have and had never had any Black faculty, that Bowling Green had not met its burden for dissolving or modifying the injunction. The district court was also concerned that Bowling Green was a member of an athletic association in Mississippi composed of private schools that the court concluded had been created mainly to avoid integration, rather than participating in the Louisiana association for athletic events, comprised of both public and private schools.

## ARGUMENT OF BOWLING GREEN

Bowling Green argues before this court that the district court erred in not holding that the

4

1975 order in the *Brumfield* case superseded the 1974 injunction in this case since Washington Parish was a defendant in both cases and that the injunctions in both cases enjoined Washington Parish School District from basically the same conduct. Bowling Green further argues that since it is now *Brumfield* certified that as a matter of law, the injunction against it should be dissolved and it should be allowed to receive public assistance as do almost all other private schools in Louisiana who have been *Brumfield* certified.[3] Bowling Green contends that because it cannot receive textbooks and other assistance from the State of Louisiana as do almost all other private schools that have been *Brumfield* certified, that Bowling Green and its students are denied equal protection of the law. Appellant also argues that based upon the facts before the court, the court should have vacated the injunction because the original reasons for the injunction no longer exist.

Bowling Green maintains that the reason the Washington Parish School Board does not want to furnish state aid to Bowling Green is the school board does not want to lose African American students to Bowling Green and because of a belief by some of the school board members that it is bad public policy for the State of Louisiana to give assistance to private schools for any reason. Bowling Green reasons that the denial of public funding is discouraging African Americans from attending Bowling Green School.

ARGUMENT OF PLAINTIFFS AND WASHINGTON PARISH SCHOOL BOARD

Plaintiffs and Washington Parish School Board argue that the *Brumfield* injunction and certification procedure did not have any impact on the 1974 injunction entered in this case, that Bowling Green and its students are not deprived of equal protection and that the court did not

_____

[3]The record contains reference to only one other private school that has been *Brumfield* certified that is also under an injunction and likewise denied public assistance.

5

abuse its discretion in refusing to vacate the injunction. The issues thus joined in this matter are submitted to this Court for decision.

DID THE *BRUMFIELD* DECISION MODIFY THE INJUNCTION IN THIS CASE?

As to Bowling Green's argument that the 1974 injunction in this case was superseded or modified by the *Brumfield* injunction, Bowling Green has offered no authority so holding, and this Court has found none. There was nothing in the 1975 order that addressed any change or modification in the 1974 order. These were two separate cases, involving some of the same issues, but also others. Accordingly, the district court should be affirmed in its holding that the 1974 injunction was not superseded or modified by the 1975 *Brumfield* injunction. *See generally United States v. United Shoe Machinery Corp.,* 391 U.S. 244, 248 (1968); *Batts v. Tow-Motor Forklift Co.,* 66 F.3d 743, 749-49 (5th Cir. 1995).

BOWLING GREEN'S EQUAL PROTECTION CLAIM

Likewise Bowling Green has offered no analogous authority to support its equal protection argument. Bowling Green argues that its students, a few minority, but mostly white, are being treated differently, thus unequally, than students in other previously segregated private schools that are overwhelmingly white, with a few minority students, that have become *Brumfield* certified. Factually this is an accurate statement and it is unfortunate. But, Bowling Green is being treated differently than other private schools because Bowling Green is under a separate injunction that other private schools are not under. That does not implicate a constitutional deprivation. *See generally City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 526 (1989) (Scalia, J., concurring); *Franks v. Bowman Transp. Co., Inc.,* 424 U.S. 747, 775 n. 35 (1976). An injunction that is granted against one school to enforce constitutional rights is not void, nor

6

impacted, by the fact that other schools could have been, but were not so enjoined, just as failure to prosecute one person does not allow another to avoid prosecution. Society has found no perfect way to enforce all rights nor cure all wrongs. Consequently, the failure to enforce a right, or cure a wrong, in one situation is not a defense to enforcing that right or curing that wrong in another situation. Finding no authority to sustain Bowling Green's argument in this regard, the decision of the district court on the equal protection issue should be affirmed.

## BOWLING GREEN'S EVIDENCE IN SUPPORT OF MODIFICATION

The real issue in this case is whether or not Bowling Green, as it has alleged, is entitled to modification of the 1974 injunction because it has demonstrated a good faith effort to eliminate vestiges of past discrimination and made meaningful progress toward becoming a fully integrated non-discriminatory school.

Ruby Adams, mother of Lee Adams, testified on behalf of Bowling Green. She testified that her son started school in a private school in California, that he was then enrolled in Annunciation Catholic School in Bogalusa, but that it did not offer as many grades as did Bowling Green. She testified that she wanted her son to continue in private school and that she sought advice at Annunciation as to where she might place him after he finished at Annunciation. She was recommended to Bowling Green. She went to Bowling Green and enrolled her son. She later moved to Covington, Louisiana, but didn't want to change schools for her son. By this time, Lee Adams, Jr., had been placed on a scholarship. Ms. Adams testified that her son has been well accepted at Bowling Green, that "he loves" the school, has friends, plays basketball, and makes good grades. Although the school offered to transport Lee Adams, Jr., from Covington to Bowling Green, the mother said she preferred to do that herself.

Bowling Green elicited testimony from the mother of Lee Adams that she received a call from a public school teacher who was one of her customers (Ms. Adams was a beautician) and wanted to know if she was going to put her child in Bowling Green.  Bowling Green sought to draw an inference that the public school teachers were discouraging African Americans from attending Bowling Green.

Bowling Green offered evidence that besides Lee Adams, other protected minorities were enrolled, including two longtime Bowling Green Korean students, and one student whose parents were from India.  Bowling Green's principal testified that Bowling Green had accepted applications for four African American children for admission in 2003 and 2004.

Although Bowling Green's original articles of incorporation did not specify that it was a segregated school, it was in fact.  In 1999,  when Bowling Green was attempting to get *Brumfield* certified, Bowling Green amended its articles of incorporation to specifically provide that it did not discriminate on the basis of race, color, sex, religion, creed, national or ethnic origin.  Bowling Green prepared a brochure to advertise its position of non-discrimination, sent letters to numerous pre-dominantly African American churches soliciting students and ran advertisements in the newspaper advertising its non-discriminatory policy and soliciting African American students.

Bowling Green's school administrator, Louis Murray, a former coach at Bogalusa High School from 1960 to 1987, testified that he had solicited some black athletes to transfer to Bowling Green with him back in 1987.   Murray won a state championship in 1969 with an integrated football team, while he was coaching at Bogalusa.  Murray testified he had talked to an African American Melton Harris who taught with him for 10 years, about Mr. Harris becoming a part of the faculty at Bowling Green.  But, Murray testified he had not been able to attract black

8

teachers. He testified that white teachers were anxious to get out of the public school system so they would take a job with a private school with a pay cut. He testified, as did Gary Reed who was with BESE and is in charge of *Brumfield* certification, that public school teachers in Louisiana become eligible for retirement and can accept their retirement pay, and immediately go back to work for the Louisiana School System at full pay. He testified that this made it difficult for him to be able to recruit African Americans who would be receiving less pay at Bowling Green, after retirement, than they could in the public school system, after retirement.

Murray testified that Bowling Green had had an open policy on admissions, and had not discriminated since 1987. Murray testified that one year after he came to Bowling Green that they changed their athletic affiliation from the "Louisiana Independent School Association" to the Mississippi Private School Association because there was less travel involved and because of the academics, spelling bees, rallies, and things of that nature that were associated with that association.

Murray testified that he had gotten a list of the parish teachers that were retiring so he could contact them and ask them to come for interviews, but acknowledged that he had not been able to attract any black faculty members. Bowling Green presented a chart showing a number of private schools in Louisiana receiving public assistance that had no African American students and no African American faculty. Bowling Green identified a few private schools that are predominantly African American that have difficulties attracting white students.

Bowling Green offered testimony from Mr. Jerry Rayborn who moved to Bowling Green in 1983 and has been president of the school board on three different occasions. He testified that he moved to Franklinton because his son, while a sophomore in high school in New Orleans, came

9

home with marijuana. He noted that Bowling Green had had a drop in student enrollment and that they needed students and they had not turned down a black student "since 1983." R. Supp.: 27. He stated "[o]ur entire membership is striving to increase our enrollment and we feel like the Black community is a good place to do that, if we can make them feel comfortable there." *Id.* at 28. Clayton Richardson, the current board chairman, testified that Bowling Green is currently recruiting students of all races. He confirmed Murray's testimony about the difficulty of attracting African American teachers because of the pay differential.

EVIDENCE OF PLAINTIFFS AND WASHINGTON PARISH SCHOOL BOARD

The plaintiffs called Mr. Freddie Jefferson, a member of the Washington Parish School Board. He taught in the public school system and testified that in his opinion Bowling Green was created for the purpose of thwarting integration. He was critical of the school's efforts to attract minorities, saying that "They put on a somewhat full press in the last couple of years, supposedly to recruit minorities, but [in] a very, very relaxed effort. . ." R. Supp.: 80. On cross examination, he testified "I'm opposed to public money being used for private sources." *Id*. at 85. Whether to provide public assistance to students in private schools is a public policy decision for the Louisiana Legislature, so long as it meets constitutional criteria. That public policy question is not a relevant issue for this court nor the parties.

Mr. Jefferson acknowledged that the letter received by his church from Bowling Green soliciting African American students was thrown away. He said that no one from Bowling Green followed up and tried to speak to the church. He said his church wanted to wait and see what was going to happen at Bowling Green.

Under questioning by the court, Mr. Jefferson said if Bowling Green really wanted to

10

attract African American students that the African American alumni groups from the various universities and colleges would be a fertile ground for Bowling Green to solicit students. Mr. Jefferson's pastor, Rev. Bruce Brown, is also a member of the Washington Parish School Board. It was stipulated that if Rev. Brown had been called to the stand, he would have testified substantially the same as Mr. Jefferson testified.

PROGRESS, BUT IS IT ENOUGH?

An indication of how things have changed, and progress has been made, is the fact that in 1975, the issue before the court was whether a statute passed by the Louisiana Legislature was being administered in an unconstitutional manner, that is, that state funds were being unconstitutionally funneled to racially segregated private schools. The three judge panel in *Brumfield* in 1975 found the Louisiana statutes as administered unconstitutional. Twenty-four years later, in 1999, it was another law of the Louisiana Legislature that brought this matter back to court. This time the Louisiana Legislature passed a law prohibiting students who graduate from previously segregated private high schools from receiving state tuition scholarships, unless those schools had stopped practicing segregation, stopped discriminating, and become *Brumfield* certified.

In a perfect society all of the vestiges of discrimination and segregation would disappear and all people would be treated equally without regard to race, color of skin, or ethnicity. We do not live in a perfect world. Therefore, we must deal with the facts as presented. This Court is committed to enforcing *Brown v. Board of Education*, 347 U.S. 483 (1954).

Bowling Green argues that it is making a good faith effort to integrate the school, but that it cannot force African Americans to join its faculty or enroll in its school. Bowling Green

11

contends that to deprive it of the same public assistance received by other private schools makes it more difficult for Bowling Green to recruit minority students and faculty. In 1999 Bowling Green enrolled its first African American student. According to the testimony before the court, if all students attended who had enrolled for the beginning of the 2003 school year, Bowling Green would have 8 students enrolled who are protected minorities (5 African Americans, 2 Koreans, and 1 Indian). That is progress.

The plaintiffs and Washington Parish School Board argue that Bowling Green made no efforts to integrate for 25 years and that Bowling Green only integrated after it was forced to do so or have its students lose their eligibility for college scholarships. They point out that no black student attended Bowling Green until 1999. Bowling Green has yet to employ a faculty member who is black. Plaintiffs question the extent and sincerity of the efforts made by Bowling Green to become an integrated school. Whether the skepticism of the Plaintiffs and the School Board is warranted, or antipathy toward the efforts of intervenors to integrate, time will tell.

FACT FINDING AND EQUITABLE RELIEF

The district court expressed grave concern that Bowling Green did not have a single African American student until 1999, and that this did not happen until Bowling Green was forced to do so or lose scholarship opportunities for its graduates. The court likewise was concerned that Bowling Green had attracted no African American faculty. The trial court concluded that at this point Bowling Green has not demonstrated a good faith commitment to eliminating the vestiges of past discrimination and has not made meaningful progress toward becoming a non-discriminatory school.

We note Bowling Green's argument that it cannot compel African Americans to join its

12

faculty or enroll as students. It could be that an African American teacher might be reluctant to teach in a private academy, previously all white and created to preserve segregation, for less money than a teacher can make in the public school sector. Nevertheless, Bowling Green must make a good faith effort to attract African American faculty. Bowling Green offered evidence that its decision to join the Mississippi Athletic Association was made for non-discriminatory reasons, travel distances for ball games, and other programs associated with that Association. The trial court was skeptical on this issue and the record is not well developed as to that question.

The trial court ordered "the parties, plaintiff, defendant, and intervenor [to] meet through its representatives and give the Court a [written] report within six months from [June 4, 2003] on what efforts the parties are making to achieve compliance with the purposes of the original injunction." R. 8: 51. The court noted that this would require "some creative lawyering, some creative work by the community, by the educators, by the people who I think are most affected by what we are doing here." *Id.* at 51. The court also noted that Bowling Green "cannot do it in a vacuum, and it cannot do it alone. I am not asking the community or parties here to forgive Bowling Green for its history or even its current practices. But I am requiring the parties to work with them." *Id.* at 52. The court said "there has to be a give and take. There has to be compromise. There has to be a change of attitude. . . . The community has to be involved in that process." *Id.* at 52. The court likewise recognized "necessary concerns for the important values of local control of public school systems . . . [and] that if a school or school system is operating in compliance for a reasonable period of time then the Court should look either to dissolve or modify the desegregation decree." *Id.* at 45-46. The court said "I hope my opinion does not cause the black families who have children at that school or the school itself, Bowling Green, to

13

stop trying to. . . eliminate discrimination." *Id.* at 50. The court noted that it envisioned the possibility that after six months "[p]erhaps next year, perhaps sooner, perhaps later this Court will receive evidence to allay the concerns that I have expressed here, that this school, that that community that it is located in are working to achieve the purpose of the injunction" and that the injunction might be modified. *Id.* at 50-51.

Before the injunction is dissolved or modified, Bowling Green is required to demonstrate that its efforts are not just to get its graduates qualified for the TOPS program. Bowling Green cannot change the past, but it must do what it can, in good faith, to eliminate the past vestiges of discrimination. Bowling Green must demonstrate over a reasonable period of time, a good faith commitment to eliminating the vestiges of past discrimination and to make meaningful progress toward becoming a fully integrated non-discriminatory school with respect to all facets of its operation. The district court has indicated that once Bowling Green has made such a demonstration, it will be entitled to relief. The district court also specifically noted that Bowling Green cannot do this by itself.

Factual findings of the district court are to be reviewed under a clearly erroneous standard. *Ross v. Houston Indep. Sch. Dist.,* 699 F.2d 218, 226 (5th Cir. 1983). Whether to grant or modify an injunction is a question of equitable relief and is reviewed by this court for abuse of discretion. *Valley v. Rapides Parish Sch. Bd.,* 702 F.2d 1221, 1225 (5th Cir. 1983), *cert. denied*, 464 U.S. 914 (1983). Bowling Green has the burden of proof. Based on the record before us, and considering the applicable standards of review, we find no error.

14

Accordingly, the decision below is

AFFIRMED.