# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-31010

United States Court of Appeals
Fifth Circuit

**FILED**

November 10, 2015

Lyle W. Cayce
Clerk

OLESS BRUMFIELD; ET AL,

Plaintiffs

UNITED STATES OF AMERICA,

Intervenor - Appellee

v.

LOUISIANA STATE BOARD OF EDUCATION,

Defendant - Appellee

v.

MITZI DILLON; TITUS DILLON; MICHAEL LEMANE; LAKISHA FUSELIER; MARY EDLER; LOUISIANA BLACK ALLIANCE FOR EDUCATIONAL OPTIONS,

Movants - Appellants

Appeal from the United States District Court
for the Eastern District of Louisiana

Before JONES, SMITH, and COSTA, Circuit Judges.

EDITH H. JONES, Circuit Judge:

The Department of Justice ("DOJ") filed a motion for further relief in this 40-year-old case in order to gain oversight and some level of control over Louisiana's school voucher program. The program provides dynamic

No. 14-31010

educational opportunities in the form of scholarships for thousands of students—85% of whom were African American in 2013—to attend better public and private schools. The district court granted the DOJ's motion for further relief and thus mandated annual reporting requirements for Louisiana's school voucher program. Concerned by this interference with the voucher program, parents of African-American students and the Louisiana Black Alliance for Educational Options ("Appellants") moved to vacate the district court's order under Federal Rules of Civil Procedure 59(e), 60(b)(4), and 60(b)(5). The district court denied the motion. We hold that the order concerning the voucher program is beyond the scope of the district court's continuing jurisdiction in this case and is therefore void for lack of subject matter jurisdiction. The district court should have granted the Rule 60(b)(4) motion. The order is reversed and the injunction is therefore dissolved.

## I

Given that the Department of Justice challenged Louisiana's voucher program through a forty-year-old lawsuit, it is not surprising that this case has a lengthy and complicated history.

## A

Before 1969, Louisiana operated "dual racially segregated systems of pupil assignment." *Brumfield v. Dodd*, 405 F. Supp. 338, 342 (E.D. La. 1975). Any African-American students attending formerly all-white schools "did so under the exercise of 'freedom of choice' options," rather than any non-discriminatory assignment practice. *Id.* Between 1969 and 1970, almost all school boards were ordered by various federal district courts to begin assigning students on a race-neutral basis. *Id.* A significant increase in private school attendance coincided with these court orders. *Id.* The Louisiana State Board of Education (now the Louisiana Department of Education) was empowered by

2

the state legislature to assist these private schools by providing textbooks, classroom materials, and transportation. *Id.*

In 1971, a group of African-American families commenced this *Brumfield* lawsuit in federal court, and the United States intervened in the lawsuit shortly after the filing. *Id.* at 340. In 1975, a three-judge district court panel held that Louisiana's practice of subsidizing racially discriminatory private schools violated the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 348. In an order attached to the findings of fact and conclusions of law, the three-judge panel ordered the state to take four actions:

- Cease "distributing or otherwise making available textbooks, library books, transportation, school supplies, equipment, and any other type of assistance, or funds for such assistance, to any racially discriminatory private school or to any racially segregated private school;"

- Implement a process for private schools to be certified as non-discriminatory and thus be eligible for assistance from the state;

- Create an accounting of all assistance provided to racially discriminatory private schools since 1968; and

- Repossess all textbooks and classroom materials that had been given to discriminatory private schools.

The court retained continuing jurisdiction with regard to the issues in the order.

The state operated under the 1975 injunction for a decade before the United States and Louisiana agreed in 1985 to refine through a consent decree the certification process for assistance-eligible private schools. The consent decree required the state to provide the DOJ with copies of all initial certification applications and all annual compliance reports until 1988, copies of all complaints of racial discrimination by private schools applying for

No. 14-31010

certification for as long as the consent decree exists, and a list by category of all the funds provided to each private school for as long as the consent decree exists. This certification regime has come to be known as *Brumfield* certification.

## B

In 2012, the Louisiana legislature passed the Student Scholarships for Educational Excellence Act. La. Rev. Stat. Ann §§ 17:4011–4025. The voucher program provides scholarships to attend public and *Brumfield*-certified private schools for students whose family income is below 250 percent of the federal poverty line and who are entering kindergarten or previously attended a school receiving a grade of "C" or lower, with preference for students in "D" and "F" schools. *Id.* at § 17:4013. Applicants to the program list their top five schools in order of preference. The eligible applications are submitted to a third-party vendor, OneApp, that runs a lottery algorithm on the applicant pool. If the highest ranked school on an applicant's list has available seats, the applicant will be awarded a scholarship to that school. If there are fewer seats than applicants to a particular school, the lottery algorithm optimally matches the students with schools, taking into account their preferences. Results are adjusted based on a few statutory preferences, such as having a sibling in a particular school. *Id.* at § 17:4015(3)(b). Applicants are then informed of their award and given an opportunity to accept or reject it. This lottery process is performed three times a year. The amount of the scholarship is capped at the average per-pupil spending for the public school district in which the applicant currently resides. *Id.* at § 17:4016(A). If the applicant is offered a slot to attend a private school, and that private school's tuition is less than the per-pupil spending of the applicant's current school, then the amount of the scholarship will be reduced to the amount of the private school tuition. *Id.*

4

No. 14-31010

In 2012–2013, Louisiana received more than 10,000 applications and awarded 4,900 scholarships. More than 90% of the recipients were minorities. The following year, the state awarded roughly 6,800 scholarships, 85% of which went to African-Americans.

## C

The DOJ's scrutiny of the voucher program began with a July 20, 2012 letter requesting information from the Louisiana Department of Education. In the letter, the DOJ stated that it wanted to review the possible impact of the voucher program on "Brumfield-approved schools participating in the program, as well as the possible impact on the public schools and/or public school systems" operating under court orders in other cases. To that end, the DOJ requested not only information and documents related to the mechanics of the program but also the name, address, grades, race, and public school history of every student receiving vouchers and every student who had been offered but declined a voucher. Louisiana responded by answering some of the questions, but maintained that the "additional [unanswered] questions appear to be unrelated to Brumfield v. Dodd approval."

Rather than file a new lawsuit, the DOJ moved to compel discovery under this case in order to get the information it sought about the voucher program. The magistrate judge granted the motion to compel discovery, but specified that the information could only be used in the present case and only by the Civil Rights Division of the DOJ.

The DOJ subsequently moved under Federal Rule of Civil Procedure 59(e) to alter the magistrate judge's order to allow the requested information to be shared within the DOJ and to be used in the various separate school

No. 14-31010

desegregation cases still pending in many Louisiana parishes.[1] The magistrate judge granted the motion to amend.

In August 2013, the DOJ filed a motion for further relief. The DOJ requested an order pursuant to the 1985 consent decree enjoining Louisiana from awarding any school vouchers to students who currently attend public school districts subject to ongoing desegregation orders. Up to this point, however, the orders in this case dealt only with the proper steps required for the state to provide money and assistance to non-discriminatory *private* schools. The *Brumfield* case never involved any desegregation issues in *public* schools. The DOJ alleged no violation of the consent decree or any other constitutional violation relating to the funding of private schools in this case. Instead, the DOJ argued that a further injunction was needed in this case because the state had failed to "seek the approval of the appropriate federal court prior to awarding the vouchers to students" attending public schools that remained subject to desegregation orders in other cases.

A telephone conference was held on September 18, 2013, to discuss the DOJ's pending motion for further relief. Following the conference, the district court entered an order setting a hearing in November and requiring the parties to brief two issues:

> (1) Does the desegregation order issued in *Brumfield v. Dodd*, 405 F. Supp. 338 (E.D. La. 1975) apply to the State of Louisiana's Student Scholarships for Educational Excellence Program ("Voucher Program") so as to require the State to obtain authorization from the Court prior to implementation? (2) If the desegregation order applies to the Program, is there any need to amend existing orders to ensure a process of review of the Voucher Program or similar ones in the future?

---

[1] Many, or most, of such cases originated in the 1960s and 1970s, but they have never been dismissed.

No. 14-31010

The court also required Louisiana's briefing to include "an analysis of the voucher awards for the 2013–2014 school year respecting impact on school desegregation in each school district presently under a federal desegregation order."

Louisiana hired an expert to produce reports on the voucher program's impact for the 2012–2013 and 2013–2014 school years. The expert, Christine Rossell, is a professor of political science at Boston University who has 26 years' experience designing and analyzing school desegregation plans. For both school years facing scrutiny, she found that the program "had no negative effect on school desegregation in the 34 school districts under a desegregation court order." The DOJ has produced no evidence to the contrary.

Five days after the September 18 order, the DOJ filed a supplement to its original motion for further relief. Without withdrawing its original motion for a permanent injunction to stop the program, the DOJ rephrased its goals as seeking an annual process that would allow the federal government to review Louisiana's voucher awards in perpetuity.

On November 22, 2013, the district court held a hearing on the two questions it posed in the September 18 order: (1) do the orders in the *Brumfield* case apply to the voucher program, thus requiring court approval of the program; and (2) is there a need to amend the orders? At the hearing, the DOJ conceded that it had no objections to the existing *Brumfield* certification process for private schools and that Louisiana had complied with that certification process and the consent decree. The DOJ disclaimed that Louisiana had been funding discriminatory private schools. Instead, the DOJ explained, its ongoing goal is "to determine whether or not assignments to those [private] schools are impeding desegregation in public schools that those [voucher] students might have been assigned to." To meet that goal, the DOJ requested a second certification process essentially to pre-approve voucher

awards.  Rather than replace it, the proposed process would run parallel to the existing *Brumfield* certification process for private schools receiving aid.

The district court issued an oral ruling at the November hearing, ultimately deciding that it had jurisdiction and that some modification to the existing thirty-year-old order would be necessary.  The district court explained its ruling on jurisdiction in two sentences.  First, the court stated that the voucher program fell under the existing orders because "this Court has an obligation, as well as all parties on both sides have an obligation, to take reasonable steps in the process whereby the voucher program is not being used to promote segregation; and, in that regards [sic], the Constitution mandates it, this case mandates it, so it does apply."  The court added: "If the voucher system is being used to assign children to segregated school systems in the private arena, that's in violation of the consent decree and the injunctions here."  The court so reasoned in spite of the fact that the DOJ had already conceded that there had been no *Brumfield* consent decree violation here, and that the private schools themselves are not "segregated."  The court then assumed that resolving the jurisdictional issue also resolved whether a modification was proper.  Once the court had ruled that a modification would be forthcoming, it required both parties to submit proposals.

On April 8, 2014, the district court entered an order creating a process for continuing federal oversight of the voucher program to operate alongside the existing private school certification process.  Beyond the word "order," the April Order contains no label or helpful phrases to indicate whether it is a modification to the 1975 order, a modification to the 1985 consent decree, or an entirely new injunction.  The document is written in a similar format and structure to the previous orders: the district court lays out a series of annual deadlines for each step of the voucher award process.  First, the order establishes that the outlined process will apply to "the 2014-2015 school year,

and for all future years…." The process requires Louisiana to report racial data for each public school in the state, as well as state test scores for each public school. For every applicant to the voucher program, Louisiana must provide the DOJ with the following information: name, ID number, address, zoned school district, previous public school, grade level, race, whether the current school is participating in the scholarship program, the applicant's school preference list, whether the student was deemed eligible to participate in the program, reasons for ineligibility, reasons for preferences in award of scholarship, and the name of the school for which Louisiana plans to offer a scholarship. The applicant information must be provided to the DOJ for review ten days before the third-party vendor, OneApp, plans on notifying the applicants of their awards to allow for what the DOJ envisioned as a give-and-take-process for voucher awards. Finally, the order makes clear that any information provided under the orders of this case may be used in any of the school desegregation cases in Louisiana and may be shared with other employees of the DOJ beyond those of the Civil Rights Division.

## D

On September 30, 2013, after the DOJ filed a motion for further relief, the parents of African-American students and the Louisiana Black Alliance for Educational Option—appellants here—filed a motion to intervene as of right, which the DOJ opposed. Fed. R. Civ. P. 24(a). The district court denied the motion for intervention, asserting that the intervenors lacked an interest in the litigation. The intervenors appealed the denial to this court, which reversed the district court on April 10, 2014. *Brumfield v. Dodd* (*Brumfield I*), 749 F.3d 339 (5th Cir. 2014). This court did not find credible the DOJ's claim that the supplement to its motion for further relief abandoned its pursuit of a permanent injunction, because the supplement still argued that the state could not operate the voucher program until the court approves it. *Id.* at 342.

No. 14-31010

Additionally, this court recognized that even though the DOJ claimed no interest in halting the program, a modification of the 1985 decree requiring Louisiana to get court approval meant that "the [federal] government will have the ability to attempt to adjust *some* element of the scholarship program—either by changing which students receive the aid or by changing the schools in which they are placed—if not to urge that the program be killed entirely." *Id.* at 343. This court held that the parents' interests met the requirements for intervention. *Id.*

Because of the district court's erroneous denial of their motion for intervention, the intervenors were unable to participate in important court proceedings. Consequently, they lost the right to participate in the November hearing that determined whether the court had jurisdiction and whether the prior case orders needed to be modified. The intervenors were also unable to participate in the oversight plan suggestion process.

The intervenors finally joined as parties a few days after the district court entered the April 8, 2014 order creating a new oversight process for the voucher program. The intervenors could not directly appeal the order created while they were excluded as parties, but they moved to vacate the order by arguing that the judgment was either void under Rule 60(b)(4) for lack of jurisdiction or should be vacated under Rule 60(b)(5) due to changed circumstances. Additionally, the intervenors moved to alter or amend the judgment under Rule 59(e). The motions were denied. The district court stated that it had adequately addressed its jurisdiction in the November oral ruling and did not elaborate further. As for the 60(b)(5) motion, the district court held that the cited law was not helpful to intervenors, because the cases were distinguishable from and preceded the April 8 order. The 59(e) motion was rejected as duplicative of the arguments presented under Rule 60(b).

10

No. 14-31010

The Intervenors have appealed the denial of their motion to vacate the April 8 order that established an ongoing oversight process for the voucher program.

## II

This court's review of intervenor's Rule 60(b)(4) motion is *de novo*. *Jackson v. FIE Corp.*, 302 F.3d 515, 521–22 (5th Cir. 2002). The rule states that a "court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: . . . (4) if the judgment is void." Fed. R. Civ. P. 60(b)(4) "Rule 60(b)(4) motions leave no margin for consideration of the district court's discretion as the judgments themselves are by definition either legal nullities or not." *Carter v. Fenner,* 136 F.3d 1000, 1005 (5th Cir. 1998).

Unlike the 60(b)(4) motion, Rule 60(b)(5) and Rule 59(e) motions "are directed to the sound discretion of the district court, and its denial of relief upon such motion will be set aside on appeal only for abuse of that discretion." *Seven Elves v. Eskenazi*, 635 F.2d 396, 402 (5th Cir. 1981).[2]

## III

The DOJ initially contends that this court lacks appellate jurisdiction because the oversight regime created by the district court is only a "discovery order" that did not continue, modify, or refuse to dissolve an injunction.[3] 28 U.S.C. § 1292(a)(1). We disagree. The oversight regime is clearly not a mere

---

[2] Because we decide this case by applying Rule 60(b)(4), we express no view on the applicability of Rule 59(e) or 60(b)(5). Obviously, however, had the district court awaited this court's decision on intervention in *Brumfield I*, this would be a direct appeal rather than one requesting post-judgment relief.

[3] Alternatively, the DOJ argues that even if the oversight regime prescribes an injunction, the denial of a motion to vacate the injunction is still not appealable under 28 U.S.C. § 1292(a)(1) because the injunction pertained only to the pending proceedings and was a step in the normal pretrial process.

discovery order, and the DOJ's position is completely at odds with the facts of the proceedings in the district court. Because the April 8, 2014 order is an injunction, the district court's denial of the 60(b)(4) motion amounts to a refusal to dissolve an injunction, making the denial appealable under this court's precedent.

Even if an order is not a final judgment within the meaning of 28 U.S.C. § 1291, the court of appeals has jurisdiction under 28 U.S.C. § 1292(a)(1), which "gives this Court jurisdiction over interlocutory orders 'granting, continuing, modifying, refusing, or dissolving injunctions.'" *Shanks v. City of Dallas, Tex.*, 752 F.2d 1092, 1095 (5th Cir. 1985).

Because the district court did not carefully label or describe the April 8 order, there is some confusion as to whether it is a modification of the 1975 injunction or the 1985 consent decree, or an entirely new injunction. The document is labeled as an "ORDER," and the paragraph that precedes the monitoring regime states only that the court has reviewed the recommendations submitted by both parties. The DOJ seizes on the district court's thumbnail introduction to argue that the April Order governs no more than discovery because it relates to the sharing of information.

The content of the April Order makes clear that it is not for discovery. The 1975 and 1985 certification processes also mandate a sharing of information, but all parties accept that the *Brumfield* certification regime is an injunction. The April Order creates a new and different certification regime for the voucher program that will be repeated annually and indefinitely. Because this oversight process is exactly the relief sought by the DOJ's motion for further relief, it is unlikely to lead to further judicial proceedings as would be expected of a discovery order. This process is not, as the government contends, like a pretrial information swap that is limited in scope and duration. The new oversight regime requires the state to engage in a costly activity:

compiling a long list of information pertaining to thousands of applicants and thousands of students as they continue to benefit from the voucher program. This is a burdensome, costly, and endless process.

The DOJ's previous actions also make clear that it never viewed its motion for further relief as no more than a discovery order. After this case lay dormant for decades, the DOJ revived it with a motion to compel discovery, which the magistrate judge granted. After the DOJ received interrogatory responses through the discovery request, the DOJ filed a motion for further relief, not a second discovery motion, asking the court to enjoin the program. Before the November hearing on the motion for further relief, the district court ordered the parties to prepare briefing on whether there was "any need to *amend existing orders*." (emphasis added). During the November 2013 hearing, the DOJ stated that it wanted to review and approve potential voucher awards in each application cycle before the state made final awards. Referring to that arrangement, the DOJ explained, "that's the modification to the process [the prior consent decree and injunction] that we're looking for." It is disingenuous for the DOJ now to argue that the motion for further relief was a request for a discovery order and the oversight regime is only for discovery.

Additionally, the district court repeatedly referred to the forthcoming relief as a modification to the existing orders. During the November hearing, the district court asked the parties how "a modification of the decree" would work. After determining he had jurisdiction over the DOJ's motion for further relief, the court ordered the parties to submit proposed "modifications to the consent decree . . . ." Thus, the court and the parties treated the April Order not as discovery, but a further injunction.

Since the April Order was an injunction, the denial of the motion to vacate the April Order amounts to a refusal to dissolve an injunction under 28 U.S.C. § 1292(a)(1). This court addressed a similar scenario in *Kerwit Med.*

*Prods., Inc. v. N. & H. Instruments, Inc.*, 616 F.2d 833, 835–36 (5th Cir. 1980). In *Kerwit*, a 1971 consent judgment resulted in an injunction against the appellants. *Id.* at 835. In 1978, the appellants moved unsuccessfully under Rule 60(b)(4) to vacate the judgment. *Id.* Appellees argued that denial of the Rule 60(b) motion was premature because the court had not completely disposed of the litigation. *Id.* This court, however, recognized that a denial of a Rule 60(b) motion under such circumstances effectively "continue[s] or refuse[s] to dissolve an injunction." *Id.* at 836. Therefore, the denial itself was appealable under 28 U.S.C. § 1292(a)(1). *Id.* As in *Kerwit*, the denial of the intervenors' motion to vacate here "refused to dissolve an injunction," and the court's order is appealable.

## IV

Turning to the merits of the appeal, Rule 60(b)(4) states that a "court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: . . . (4) if the judgment is void." Fed. R. Civ. P. 60(b)(4). An order "is void only if the court that rendered it lacked jurisdiction of the subject matter, or of the parties, or it acted in a manner inconsistent with due process of law." *Williams v. New Orleans Pub. Serv., Inc.*, 728 F.2d 730, 735 (5th Cir. 1984). Other errors in an underlying order will not afford grounds for relief under the narrow ambit of Rule 60(b)(4) as they would if the order itself had been directly appealed. *Carter v. Fenner*, 136 F.3d 1000, 1005 (5th Cir. 1998).

We conclude that the April Order is void for lack of subject matter jurisdiction because the voucher program is outside the scope of the district court's continuing jurisdiction in this case. Jurisdiction in an ongoing institutional reform case "only goes so far as the correction of the constitutional infirmity." *United States v. Texas*, 158 F.3d 299, 311 (5th Cir. 1998). The original 1975 decision held that the state violated the Equal Protection Clause

by providing public aid to discriminatory and segregated private schools. *Brumfield v. Dodd*, 405 F. Supp. 338, 348 (E.D. La. 1975). In the 1975 order, the district court retained continuing jurisdiction for the remedial purpose laid out in the order, which was to prevent future state aid to discriminatory private schools. For three reasons, the April 8 Order goes beyond correcting— and indeed has nothing to do with—the violation originally litigated in this case. First, the voucher program's potential impact on desegregation orders for public schools in separate federal desegregation cases is distinct from eliminating public funding for discriminatory private schools. Second, the voucher program aid is for *students* rather than *private schools*. Finally, even if the voucher program aids private schools, it is not being given to *discriminatory* private schools. The district court's order exceeded the constitutional infirmity on which this case was predicated and is therefore void.

## A

The district court did not provide a detailed explanation for its ruling on the issue of its jurisdiction. At the November 2013 hearing, the district court orally held that "the voucher program would still be under the ambit" of the original orders in this case. The court only provided a few sentences of explanation. In part, the court explained that "this Court has an obligation, as well as all parties on both sides have an obligation, to take reasonable steps in the process whereby the voucher program is not being used to promote segregation; and, in that regards [sic], the Constitution mandates it, this case mandates it, so it does apply."[4] When the court denied the Intervenors'

---

[4] The district court gave some indication as to how it viewed the scope of the present case by asking the DOJ whether it was better to monitor the impact of the desegregation orders in the parish cases "in this overall case; or is it more effective to do it in the individualized case?" This reveals a misunderstanding of the issue in this case. The present case is not the "overall" statewide version of the parish desegregation cases. The parish cases

No. 14-31010

Rule 60(b)(4) motion, it did not respond to their lack of jurisdiction argument except to state that jurisdiction was "addressed at the November 22 hearing . . . ."

## B

The correct analysis of the scope of the court's continuing jurisdiction begins by identifying the constitutional infirmity addressed by this case in 1975. *United States v. Texas*, 158 F.3d at 311. The original 1975 decision ruled that "[b]ecause [the Louisiana statutes governing school funds] are implemented by defendants so as to allow substantial state assistance to racially segregated private schools, the statutes run afoul of the equal protection clause." *Brumfield*, 405 F. Supp. at 348. Based on this holding, the court enjoined further state aid to discriminatory private schools and created the *Brumfield* certification process to ensure that only non-discriminatory private schools were eligible for state aid. The 1975 order and 1985 consent decree require information about the private schools; those orders do not concern public school districts, the desegregation of which the DOJ and federal courts continue to monitor in separate cases. *See, e.g.*, *Moore v. Tangipahoa Parish Sch. Bd.*, 507 F. App'x 389, 390 (5th Cir. 2013). The *Brumfield* orders also do not prevent aid to non-discriminatory private schools. Consequently, any order issued under the district court's continuing jurisdiction over *this* case had to be related to correcting the constitutional violation of providing state aid to racially discriminatory private schools.

---

resulted in public schools desegregation orders; this case is not a desegregation case at all, but solely dealt with ending unconstitutional funding of private schools.

The court later added: "If the voucher system is being used to assign children to segregated school systems in the private arena, that's in violation of the consent decree and the injunctions here." This is factually incorrect. The DOJ has neither alleged that the program assigned children to segregated schools nor that the consent decree had been violated.

No. 14-31010

The DOJ's concern that the voucher program may affect desegregation in public schools covered by other court orders is simply unrelated to the constitutional infirmity that was litigated and decided *in this case.* The DOJ has not alleged that the state has violated the 1975 order or the consent decree, that the state has found a way to comply with the 1975 order or the consent decree while still giving aid to discriminatory private schools, or that providing vouchers to students promotes discriminatory policies in private schools. The only evidence before the trial court shows that there have been no negative effects on the desegregation of Louisiana's public schools. Instead, the DOJ contends that the state's voucher program *might* potentially frustrate the desegregation of public school districts in other pending cases. The DOJ admits that this position amounts to a fishing expedition. Its concession, moreover, that Louisiana public school desegregation has not been adversely affected by the voucher program essentially acknowledges the legal and factual disconnection of the *Brumfield* case from the parish cases.

The state's voucher program is also outside the scope of this case because it provides aid to *students* rather than to *private schools.* First, the voucher program allows students to state their preference for public or private schools on their applications. It is then the students' choice to accept the state scholarship so no money is given to a school, public or private, without the approval of the students' families. Second, the scholarship pays for the individual student's education; it does not aid private school operations. That is made clear by the fact that the scholarship is capped at the amount the state would have spent on the child had the child attended a local public school. La. Rev. Stat. § 17:4016. The scholarship covers the marginal cost of educating an additional child.

Although it involved the Establishment Clause, *Zobrest v. Catalina Foothills School Dist.*, 509 U.S. 1, 113 S. Ct. 2462 (1993), considered an almost

identical issue: whether a statute that provided sign language interpreters for deaf students in religious schools amounted to unconstitutional aid for religious private schools. *Id.* at 12–13. The Court recognized that the effect of the statute was not to subsidize private school functions but to assist disabled children. *Id.* at 12. Similarly, the Louisiana program is not designed to aid existing private schools. The money follows the child, whether to public or private school. If the child chooses to remain at his or her current public school, no money is given to the alternative voucher program school. This program is hardly analogous to the public in-kind aid rendered to private schools in the 1970s, which subsidized the schools. *Brumfield*, 405 F. Supp. at 347. The current Louisiana voucher program is best characterized as aid to poor children rather than aid to private schools. Therefore, it is outside the jurisdiction of this case.

Finally, even if the vouchers constituted aid to private schools, the district court did not have jurisdiction over the program, because the aid did not go to *discriminatory* private schools. Aid to racially non-discriminatory private schools is not subject to the court orders in this case. Because the DOJ has conceded that the *Brumfield* certification process is working properly and that all the private schools participating in the voucher program are *Brumfield* certified, the April Order concerning the voucher program is not correcting the constitutional infirmity—aid to racially discriminatory private schools— because the infirmity is not even alleged to exist. On this basis as well, the April Order exceeds the continuing jurisdiction of the district court.

No. 14-31010

## C.

Our colleague takes issue with this decision for two reasons.[5] His thoughtful dissent merits a reply.

Initially, the issue of Intervenors' standing to appeal is, for good reason, no longer challenged by the government or briefed by the parties. Although jurisdictional, the Intervenors' presence on appeal is settled by the law of the case and the scope of the district court's order. In *Brumfield I*, this court rejected the government's characterization of its "data request" as anything other than a step on the road to enjoining the voucher program unless and until the state receives "authorization from the court prior to implementation." 749 F.3d at 342. Whether the government succeeds in its ultimate goal is not the point. Citing numerous prior cases, the court explained that the Intervenors' interests are indeed affected by ongoing district court proceedings, and, "[t]he parents challenge the very premise that the Scholarship Program is subject to any such proceedings." *Id.* at 343.[6] The court also thoroughly

---

[5] The dissent also engages in editorial commentary about, on one hand, the educational success of Louisiana's school voucher program and on the other hand, the need for continuing vigilance over public school desegregation. As these expressions of opinion are irrelevant and the materials cited are far afield of the dissent, we do not respond.

[6] To reiterate, DOJ has never withdrawn its motion to modify the 1985 consent decree. This court responded:

> To be sure, the United States is claiming that, at the moment, it has no intention of halting the voucher program or depriving anyone of an existing scholarship. Yet, if a modification of the decree requiring court approval means anything, it signifies that the government will have the ability to attempt to adjust *some* element of the Scholarship Program—either by changing which students receive the aid or changing the schools in which they are placed—if not to urge that the program be killed entirely. The possibility is therefore real that if the parents are not able adequately to protect their interests, some students who otherwise would get vouchers might not get them or might not get to select a particular school they otherwise would choose. The parents need not wait to see whether that ultimately happens; they have already described an interest justifying intervention.

*Brumfield I,* 749 F.3d at 343-44.

19

explained why the Intervenors need only prove that their interests "may" be impaired or impeded by the pending proceedings, not that they *will* be harmed. *Id.* at 344. "It would indeed be a questionable rule that would require prospective intervenors to wait on the sidelines until after a court has already decided enough issues contrary to their interests. The very purpose of intervention is to allow interested parties to air their views so that a court may consider them before making potentially adverse decisions." *Id.* at 345. An even more perverse rule would deny these Intervenors' right to appeal now, when they were erroneously prevented by the district court from airing their views before it ruled against their interests as described in *Brumfield I.* Finally, the district court order directly affects the Intervenors insofar as it (1) requires the state to disclose to the federal government personal information about each student who applied for a voucher, (2) affords DOJ a pre-voucher award review of this information, and (3) compels yearly updated disclosures.

With more plausibility, the dissent contends that in allowing relief for "void" judgments, Rule 60(b)(4) is limited to cases where the lower court lacked jurisdiction of the subject matter or the parties. Short of such circumstances, the dissent asserts, Rule 60(b)(4) relief is unavailing to the Intervenors. We cordially disagree. This court's case law is more nuanced. *Williams*, 728 F.2d at 735, held that a judgment is void under Rule 60(b)(4) only if the court lacked jurisdiction of the subject matter, or of the parties, "or it acted in a manner inconsistent with due process of law." In any event, the Supreme Court's most recent pronouncement concerning this rule did not mention these criteria. *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 270, 130 S. Ct. 1367, 1377 (2010). Instead, the Court stated:

> Although the term 'void' describes a result, rather than the conditions that render a judgment unenforceable, it suffices to say

that a void judgment is one so affected by a fundamental infirmity that the infirmity may be raised even after the judgment becomes final . . . . The list of such infirmities is exceedingly short, otherwise, Rule 60(b)(4)'s exception to finality would swallow the rule.

*Id.*

The Court decided, however, that *Espinosa* presented no opportunity to review lower courts' assertions, construing Rule 60(b)(4), that a judgment is void because of a jurisdictional defect only in the exceptional case "in which the court that rendered judgment lacked even an 'arguable basis' for jurisdiction." *Id.* The Supreme Court, in sum, has not definitively interpreted this rule.

The dissent relies on various cases, not one of which is remotely similar to the instant case factually, temporally, or legally,[7] while it attempts to distinguish the apposite precedent from this court and the Supreme Court. In *United States v. Texas, supra*, this court applied the Supreme Court's decisions that have systematically confined federal courts' desegregation jurisdiction to remedial orders that do not exceed "the correction of the constitutional infirmity." 158 F.3d at 311. This court reiterated that, "[a]bsent any showing that school authorities 'have in some manner caused unconstitutional segregation,' the district court lacks any power to enjoin a change in school boundaries." *Id.* at 309 (citing *Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 434, 96 S. Ct. 2697, 2704 (1976) (*quoting Swann v. City of Charlotte-Mecklenburg*, 402 U.S. 1, 28, 91 S. Ct. 1267, 1282 (1971))). According to the dissent, these cases concern "remedies" rather than the courts' absence of "subject matter jurisdiction." Consequently, the courts could abuse

---

[7] *Turner Const. Co. v. United States*, 645 F.3d 1377 (Fed. Cir. 2011) (bid protest concerning government contract award); *Callon Petroleum Co. v. Frontier Ins. Co.*, 351 F.3d 204 (5th Cir. 2003) (performance on surety bond); *In re Zale Corp.*, 62 F.3d 746 (5th Cir. 1995) (applicability of settlement agreement to third parties to bankruptcy reorganization); *EEOC v. Safeway Stores, Inc.*, 611 F.2d 795 (10th Cir. 1979) (calculation of seniority for employees in company bound by a consent decree).

their "remedial" jurisdiction but they would not have lacked power to act. There are two responses to this argument.

First, the lower courts were held to lack "remedial" jurisdiction in these school desegregation cases because no underlying constitutional violation had been found which was related to or necessitated the particular remedy. Without any predicate finding of a constitutional violation, the courts "lack power" to implement orders concerning a state's educational programs. Courts no more have power to invoke remedies against public bodies without liability judgments than they do to adjudicate controversies not fitting within under federal jurisdictional standards.[8]

Second, the lack of remedial power is compounded in this case because no federal constitutional violation has been alleged, litigated or adjudicated concerning Louisiana's voucher program. As we have noted, the DOJ concedes it cannot even allege such a violation, and the only record evidence, including that cited by the dissent, points in favor of the program's constitutionality. At least in *United States v. Texas* and other desegregation decisions of the Supreme Court and this court, prior litigation had proven that public entities ran segregated public schools; desegregation orders were tailored to remedy the vestiges of segregation; and the courts' subsequent orders pertained (even

---

[8] A string of cases in this circuit has followed the Supreme Court's desegregation rulings and reversed unauthorized orders that were claimed to spring from an old state-wide Texas desegregation decree. *See Samnorwood I.S.D. v. Texas Educ. Agency*, 533 F.3d 258 (5th Cir. 2008) (court lacked authority to enforce desegregation decree against districts that had never been sued); *United States v. Texas (Hearne)*, 457 F.3d 472, 484 (5th Cir. 2006) (court lacked authority under decree to prohibit student transfers without showing of district's unconstitutional behavior); *United States v. State of Texas (Goodrich)*, 158 F.3d 299, 309 (5th Cir. 1998) (court could not prevent detachment and annexation by school district without showing that authorities caused segregation); *United States v. Texas*, 680 F.2d 356, 372 (5th Cir. 1982) (bilingual education mandate could not be imposed under statewide decree without a finding of liability). The limit of federal courts' remedial jurisdiction is plain under these rulings. At what point does the imposition of novel "remedial orders" pursuant to increasingly antique desegregation consent decrees, without predicate liability findings, become not merely unauthorized, but abusive of federal courts' power?

if tenuously, given the passage of time) to the already-found violations. (Still, the law confirms that additional "remedies" were beyond the courts' power.)

Treating these cases narrowly, the dissent contends that "the existence of federal question jurisdiction in this section 1983 case that was filed more than four decades ago should end our inquiry." But what DOJ is doing here is not "this section 1983 case" from forty years ago, nor is this dispute even related to the forty-year-old case. The original lawsuit here concerned the state's subsidy to racially discriminatory private schools; public schools were in no way involved nor did they participate. The court ordered the state to cease such funding and certify the private schools as non-discriminatory in order to obtain state aid. This remedy was tailored to the precise violations found and, again, had nothing to do with desegregation of the public schools. There is no dispute that the state has complied in good faith over the past decades.

Now, however, the DOJ seeks to "reopen" this dormant case in order to (a) conduct an ongoing inquisition about the voucher program; (b) acquire reams of data from the state about both the public schools and thousands of private individuals who have signed up for the program; (c) ascertain the racial impact of the program on public schools in many parishes that are subject to separate court cases and desegregation decrees; and (d) maybe, someday assert that the new voucher program unconstitutionally affects the public schools.[9] (It bears mention that DOJ agrees that the *Brumfield* certification process isn't related to and has nothing to do with the voucher program.)

___

[9] The dissent acknowledges the fundamental difference between the voucher dispute and the original case: "What the district court did was order that the State of Louisiana turn over demographic information about the enrollment to the Department of Justice, which wants to determine if the voucher program will have a negative effect on schools subject to desegregation plans."

No. 14-31010

A hypothetical explains why the court's order in this case is void for lack of jurisdiction.  Suppose a consent decree were formulated to enjoin a state from failing to provide adequate prisoner medical care required by the Eighth Amendment.  The state complies with the decree in good faith.  Decades later, a party tries to "reopen" the case, asserting that the state is now violating the Eighth Amendment by allowing rats to run wild in the prisons.  No one would doubt that the federal court must dismiss the motion because it lacks jurisdiction to decide matters unrelated to the scope of the original decree.  If the court had no power to decide a new controversy through the medium of an old, unrelated decree, surely it has no power to order the state, under the guise of the original decree and without any new finding of illegal activity, to begin massive reporting on rat populations and control throughout the prison system.  The DOJ here is chasing rats.

The court's order, imposing a vast and intrusive reporting regime on the State without any finding of unconstitutional conduct related to the *Brumfield* litigation, much less the filing of a proper lawsuit, "was so affected by fundamental infirmity" that the infirmity was properly raised after judgment, *Espinosa*, 559 U.S. at 570, 130 S. Ct. at 1377, and the court acted without jurisdiction and "in a manner inconsistent with due process of law."  *Williams*, 728 F.2d at 735.

## CONCLUSION

DOJ's attempt to shoehorn its regulation of the voucher program into an entirely unrelated forty-year-old case represents more than ineffective lawyering.  Despite the district court's contrary conclusion, it seems plain that DOJ's expressed concern—how the voucher program affects statewide public schools racially—has nothing to do with the narrow issues considered in the *Brumfield* litigation.  DOJ's bold strategy, if upheld, would circumvent the ordinary litigation process in two ways.  The reports it seeks do not fall under

the auspices of discovery permitted by the Federal Rules of Civil Procedure, which authorize the compelled production of information only after a complaint alleges violations of law. Here, there was no complaint, hence no basis for DOJ to intrude into the affairs of Louisiana and its disadvantaged student population. American discovery follows the common law adversary process, not the civil law's inquisitorial process, yet DOJ seeks to be the inquisitor. Even more disturbing, DOJ's motion, as explained in the November 2013 hearing, essentially foretells its attempt—through pre-award "back and forth" with the state on every single voucher—to regulate the program without any legal judgment against the state. This court may not speculate why DOJ chose to avoid the path of litigation to prove a violation and thereafter enforce a remedy against the state and its school children. What is clear is that DOJ chose an unauthorized means to accomplish the same result.

The district court did not have jurisdiction over the subject matter of the DOJ's motion for further relief, which was outside the continuing jurisdiction of the 1975 order and the 1985 consent decree. Therefore, the April Order is void and the denial of the 60(b)(4) motion is reversed.

For the foregoing reasons, the April 2014 order of the district court is **REVERSED**, the injunctive requirements for "further relief" are **DISSOLVED,** and the case is remanded with instructions to **DISMISS** the Motion for Further Relief.

No. 14-31010

GREGG COSTA, Circuit Judge, dissenting:

Louisiana, with post-Katrina New Orleans leading the way, has become an important, and early studies show successful,[1] laboratory for education reform. One of those reforms provides scholarships to low-income students to enable them to attend better schools, the type of schools that most lawyers take for granted that their children will attend. Whether those students will continue to receive those "dynamic educational opportunities" (Maj. Op. at 1–2) is not at issue in this appeal. The ruling that the Intervenors challenge did not prevent the students from receiving scholarships for the 2014–15 school year or the current one. What the district court did was order that the State of Louisiana turn over demographic information about enrollment to the Department of Justice, which wants to determine if the voucher program will have a negative effect on schools subject to desegregation plans. For two reasons, that is not a decision that we should review given the procedural posture in which this appeal arises.

First, I have significant doubts that the Intervenors have standing to bring this appeal. This Court's earlier decision recognizing that the Intervenors have an interest in the case warranting intervention does not automatically establish that they have suffered a sufficient injury from the limited order being appealed to confer standing at this stage. *See Diamond v. Charles*, 476 U.S. 54, 68 (1986) ("Diamond's status as an intervenor below, whether permissive or as or right, does not confer standing sufficient to keep the case alive in the absence of the State on this Appeal."); *see also Rohm & Hass Texas, Inc. v. Ortiz Bros. Insulation, Inc.*, 32 F.3d 205, 208 & n.12 (5th

---

[1] Douglas N. Harris, *Good News for New Orleans: Early Evidence Shows Reforms Lifting Student Achievement*, 15 EDUCATION *NEXT* 8 (Fall 2015).

Cir. 1994) ("Merely because a party appears in the district court proceedings does not mean that the party automatically has standing to appeal the judgment rendered by that court."). Certainly the Intervenors would have standing to appeal a decision invalidating the voucher program. That would implicate the substantial injury of losing an educational opportunity for one's child, which was the basis for allowing the intervention. *Brumfield v. Dodd*, 749 F.3d 339, 343–345 (5th Cir. 2014). But the district court has not taken that step. At this point, it has deprived the students of nothing nor required them or their parents to do anything. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) ("The regulations under challenge here neither require nor forbid any action on the part of respondents. . . . '[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish.'") (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992)). Only the State of Louisiana, which has not appealed, is under an obligation to produce the data. A third-party typically does not have standing to challenge an order requiring another party to produce information when no confidential data concerning the third party is at issue. There is no contention that is the case here. So the case for standing rests on a long chain of events that perhaps might lead one day to a ruling that would result in the injury of losing the scholarships: 1) the data would have to provide some arguable basis for concluding that the scholarship program is increasing segregation; 2) the Department of Justice (which by this point would likely be part of a different Administration) would have to seek to enjoin the scholarship program based on this data; 3) the district court would have to grant the motion. On its face, this many conditions entails a high degree of speculation. But the fact that the available data indicates that 85% of the scholarships in 2013 went to African-American students (Maj. Op. at 2) means it is extremely unlikely—indeed

almost unfathomable—that release of the full data would ever lead to enjoining the voucher program on the ground that it is resegregating Louisiana schools. If nothing else, that court action is not "certainly impending." *Clapper v. Amnesty Int'l USA*, 133 S.Ct. 1138, 1150 (2013).

Admittedly, however, the line between imminent and speculative injuries can be a fuzzy one. *See Summers*, 555 U.S. at 565 n.2 ("[I[mminence is concededly a somewhat elastic concept."). More definite are the limitations on our ability to provide relief from a "void" judgment pursuant to Federal Rule of Civil Procedure 60(b)(4), which is the mechanism through which the Intervenors sought to vacate the order requiring the State to share the information. There are only "two circumstances in which a judgment may be set aside under Rule 60(b)(4): 1) if the initial court lacked subject matter or personal jurisdiction; and 2) if the district court acted in a manner inconsistent with due process of law." *Callon Petroleum Co. v. Frontier Ins. Co.*, 351 F.3d 204, 208 (5th Cir. 2003). The majority opinion tries to fit the district court's ruling as fitting into the first category of jurisdictional defects.[2] But because a court's issuance of an injunction that exceeds its equitable powers does not undermine the court's subject matter jurisdiction, Rule 60(b)(4) is the second bar to reaching the merits of this appeal.

"Jurisdiction" is a term that can mean different things, usually related to a court's power or authority to do something. *See United States v. Cotton*, 535 U.S. 625, 630 (2002) (noting that a prior Supreme Court decision had relied on an "elastic conception of jurisdiction" different from the more limited notion of subject matter jurisdiction); *see also* BLACK'S LAW DICTIONARY (10th ed.

---

[2] The opinion does include a couple references to a lack of due process. Maj. Op. at 24. The district court only issued its challenged order after providing the State with "notice [and] an opportunity to be heard." *United States Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 271 (2010) (describing the Rule 60(b)(4) due process standard).

2014), 981–83 (listing four definitions for "jurisdiction" and over three pages of definitions for particular types of jurisdiction). But as the Supreme Court has recently explained, only a "certain type of jurisdictional error" justifies the "rare" act of Rule 60(b)(4) postjudgment relief. *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 268 (2010). As already mentioned, both in this circuit and others, those types of jurisdictional error are limited to when a court "lacked jurisdiction of the subject matter, or of the parties."[3] 11 Charles Alan Wright & Arthur Miller, FEDERAL PRACTICE AND PROCEDURE § 2862 (3d ed.); *see also* 12 James Wm. Moore, MOORE'S FEDERAL PRACTICE § 60.44[1][a] ("A judgment is valid whenever the court that renders it has jurisdiction over the subject matter and the parties. In other words, a judgment is void, and therefore subject to relief under Rule 60(b)(4), 'only in the rare instance where a judgment is premised either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard.'") (internal citation omitted).[4] We thus have recognized that even when a court lacked authority, or one might colloquially say "jurisdiction," to take a certain action, Rule 60(b)(4) is not an avenue for relief.

*Callon Petroleum* was a case brought in federal court to recover on a bond. By the time the court entered judgment in favor of the plaintiff, a state

---

[3] And even when subject matter jurisdiction is at issue, "[o]nly when the jurisdictional error is 'egregious' will courts treat the judgment as void." *Callon Petroleum*, 351 F.3d at 208 (quoting *United States v. Tittjung*, 235 F.3d 330, 335 (7th Cir.2000)).

[4] Whether the "jurisdictional" errors subject to Rule 60(b)(4) correction are limited to those involving defects in subject matter or personal jurisdiction appears to be the crux of the panel's disagreement. On this point, the majority opinion is correct that *Espinosa* did not specifically refer to subject matter or personal jurisdiction when mentioning the "type of jurisdictional error" correctable under Rule 60(b)(4). Notably, however, it cited with approval these sections of the two leading federal procedure treatises that characterize those two types of jurisdiction as the only ones that warrant Rule 60(b)(4) relief. *Espinosa*, 559 U.S. at 269. More importantly, the lack of a more direct Supreme Court holding on this question is of no moment when our own case law recognizes the limitation. *See Callon Petroleum*, 351 F.3d at 208.

court delinquency proceeding for the defendant had commenced, which resulted in entry of an order that it was later argued prevented the federal court from entering judgment.  The federal court's diversity jurisdiction was enough to defeat the Rule 60(b)(4) motion even though we noted that *Burford* abstention was probably appropriate given the state insolvency proceeding. *Callon Petroleum*, 351 F.3d at 208–09.

Just as the existence of diversity jurisdiction in *Callon Petroleum* was enough to defeat the Rule 60(b)(4) motion, the existence of federal question jurisdiction in this section 1983 case that was filed more than four decades ago should end our inquiry.  That is true even if the court here, as the majority opinion concludes, went beyond its equitable powers in ordering the state to produce the data.  Courts in areas of the law ranging from bankruptcy to the Tucker Act have long recognized that a court's exceeding the scope of its equitable powers does not mean it lacked subject matter jurisdiction.  *See, e.g., Gordon v. Washington*, 295 U.S. 30, 36 (1935) ("Since the court had power to act, it is necessary to consider the various objections urged to the decree only in so far as they are addressed to the propriety of its action as a court of equity. These objections were not foreclosed by the determination that the court had jurisdiction"); *Turner Const. Co. v. United States*, 645 F.3d 1377, 1388 (Fed. Cir. 2011) (finding an order that the Army reinstate a contract did not raise a jurisdictional question because, while the appellant "frames this challenge as a jurisdictional argument, it is actually a challenge of the scope of the Court of Federal Claims' equitable powers" and these "concepts are distinct").  We recognized as much in *In re Zale Corp.*, 62 F.3d 746 (5th Cir. 1995), when we offered the following explanation for why we first had to decide a difficult question of subject matter jurisdiction "[b]efore we address[ed] whether the bankruptcy court properly exercised § 105 power to issue the injunction":

> Subject matter jurisdiction and power are separate prerequisites to the court's capacity to act. Subject matter jurisdiction is the court's authority to entertain an action between the parties before it. Power under section 105 is the scope and forms of relief the court may order in an action in which it has jurisdiction.

*Id.* at 751 (quoting *In re Am. Hardwoods, Inc.*, 885 F.2d 621, 624 (9th Cir. 1989)).

*United States v. Texas*, 158 F.3d 299, 311 (5th Cir. 1998), and the similar cases on which the majority opinion relies to establish that the problems it identifies with the court order are jurisdictional ones that implicate Rule 60(b)(4), is consistent with the line *Zale* draws. It says that "federal *remedial* jurisdiction goes only so far as the correction of the constitutional infirmity."[5] *Id.* at 311 (emphasis added). That statement relied on authority like *Missouri v. Jenkins*[6] and *Milliken v. Bradley*,[7] which are taught in law school courses on Remedies, but that say nothing about subject matter jurisdiction and thus are not mentioned in Federal Courts. *Compare* Douglas Laycock, MODERN AMERICAN REMEDIES (2d ed. 1994) at 284–93, 300–309 (discussing *Jenkins*, *Milliken*, and other cases addressing the scope of equitable power), *with* Charles Alan Wright and John B. Oakley, FEDERAL COURTS: CASES AND MATERIALS (10th ed. 1999) (not mentioning these cases). Indeed, the majority opinion cites no case ever granting Rule 60(b)(4) relief based on a court's exceeding its equitable power. Nor any case finding more generally that an

---

[5] Further proof that *United States v. Texas* did not involve a problem of subject matter jurisdiction (a term not mentioned in the opinion) is that we reversed the order rather than vacated it. *See U.S. v. Texas,* 158 F.3d at 312. The latter is the proper resolution when subject matter jurisdiction is lacking. *See, e.g., Howery v. Allstate Ins. Co.*, 243 F.3d 912, 921 (5th Cir. 2001) (vacating and remanding with instructions to dismiss due to lack of subject matter jurisdiction).

[6] 491 U.S. 274 (1989).

[7] 433 U.S. 267 (1977).

overly broad injunction (or absence of authority to award some other remedy) goes to a court's subject matter jurisdiction.

This absence of authority is telling and should be dispositive. If any doubt remains, however, other situations in which courts have rejected Rule 60(b)(4) motions further demonstrate the inapplicability of the rule in this case. The Tenth Circuit twice refused to grant Rule 60(b)(4) relief to vacate consent decrees that may have been unlawful, concluding that those legal errors did not undermine the court's subject matter jurisdiction. *Equal Employment Opportunity Com'n v. Safeway Stores, Inc.*, 611 F.2d 795, 799–800 (10th Cir. 1979) (refusing to find consent decree void under Rule 60(b)(4) even though the "grant of enhanced seniority rights to all post-decree transferees rather than to all employees or to minority transferees only does not fulfill any legitimate purpose of Title VII") *V.T.A., Inc. v. Airco, Inc.*, 597 F.2d 220, 226 (10th Cir. 1979) ("Even if the parties' consent decree does technically run afoul of federal patent law principles, the problem would be one of relief from an erroneous judgment, not a void one. The district court had requisite jurisdiction over the parties and over the subject matter."). *Safeway Stores* explained the reasoning this way:

> It is not the purpose of Rule 60(b) or the inherent powers of chancery to allow the modification of a consent decree merely because it reaches a result which could not have been forced on the parties through litigation. . . . The fact that a consent decree exceeds the law by prohibiting lawful conduct, or by granting an unauthorized remedy, does not render it void. Such efforts may be grounds for reversal on appeal of the judgment, but they are not grounds for collateral attack.

*Safeway Stores*, 611 F.2d at 799–800 (internal citations omitted).

The Supreme Court's recent Rule 60(b)(4) case, with bankruptcy again being the subject matter, provides the final illustration of just how narrow the Rule is. The Court explained that Rule 60(b)(4) relief was not warranted

because the Bankruptcy Code "requirement that a bankruptcy court find undue hardship before discharging a student loan debt is a precondition to obtaining a discharge order, not a limitation on the bankruptcy court's jurisdiction." *Espinosa,* 559 U.S. at 272. The relief the bankruptcy court ordered—discharge of the student loan without a hardship finding—was thus unlawful, but that did not render the judgment void. The same is true here, even if the majority opinion is correct that the relief ordered by the district court was unlawful.

*Espinosa* also explains why it is important to preserve the limited meaning of a "void judgment":

> Although the term 'void' describes a result, rather than the conditions that render a judgment unenforceable, it suffices to say that a void judgment is one so affected by a fundamental infirmity that the infirmity may be raised even after the judgment becomes final. The list of such infirmities is exceedingly short; otherwise, Rule 60(b)(4)'s exception to finality would swallow the rule.

*Id.* at 270.[8] That interest in finality, along with the interest in restraint, is particularly strong here. The students are receiving the scholarships, the Department of Justice was getting the data it wanted, and the State did not see the need to appeal with its program intact.

The majority opinion's "rats" hypothetical undoubtedly describes an extreme abuse of judicial authority. But courts act outside the scope of their authority all the time, sometimes outrageously so but more often as a result of the difficulty and variety of the issues we face. It would likewise be a flagrant violation of the law for a court to award a $100 million punitive damages award

---

[8] Expanding the reach of Rule 60(b)(4) makes even less sense in the context of an injunction because Rule 60(b)(5) provides a mechanism for relief when an injunction in a long-running institutional reform case like this one "is no longer equitable." Fed. R. Civ. P. 60.

against a municipality in a section 1983 case. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981) (holding that section 1983 does not permit an award of punitive damages against a municipality). Because of the blatant error, such an award would be readily correctable in the normal appellate posture. A punitive damages award exceeding the court's remedial power would not, however, mean that the court lacked subject matter jurisdiction. *See Gil Ramirez Grp., L.L.C. v. Houston Indep. Sch. Dist.*, 786 F.3d 400, 408, 413 (5th Cir. 2015) (affirming a dismissal pursuant to Rule 12(b)(6) for failure to state a claim, rather than pursuant to 12(b)(1) for lack of subject matter jurisdiction, of a RICO claim seeking treble damages in light of *City of Newport*). The same would be true for the rat court's abuse of its remedial power. That error, like all others including the unauthorized desegregation orders the majority opinion cites, is correctable on direct appeal. But it is not among the errors that can be asserted under the "rare" 60(b)(4) procedure. *Espinosa*, 559 U.S. at 271.

The majority opinion may well be correct that the Department of Justice should have litigated this issue in the numerous school desegregation cases still pending in Louisiana federal courts rather than this one that focused on state aid to segregation academies. And the statistics showing that 85% of the scholarship recipients are African-American indicate that not just its litigation strategy, but also its concern about the potential effect of the voucher program on desegregation may have proven misguided. But vigilance about retrenchment in the area of school desegregation is not. *See* Marguerite L. Spencer and Rebecca Reno, *The Benefits of Racial and Economic Integration in Our Education System: Why This Matters for Our Democracy*, Kirwan Institute for the Study of Race and Ethnicity, The Ohio State University (Feb. 2009) at 13 ("The number of nearly all-minority schools (defined as a school where fewer than 5% of the students are white) doubled between 1993–2006.

… In 2005–2006, 56% of Hispanic students attended a school in which at least half of the student population was Hispanic, and nearly 50% of black students attended a majority black school."). For the years of blood, sweat, and tears that went into the efforts to achieve desegregation didn't just help us finally realize the promise of the Fourteenth Amendment.  That work also resulted in integrated schools—albeit too few and too short-lived—that provided substantial gains for minority students.  *See, e.g., id.* at 13 ("[D]esegregation has been positively linked to increases in black student achievement levels, generating gains on average of .57 of a grade year at the kindergarten level, and on average of .3 of a grade year in student performance at the elementary/secondary school level. . . . Some argue that since most school reforms have little or no effect on improving students' outcomes, the modest impact that desegregation has on student achievement relative to these other reforms is substantial."); Rucker C. Johnson, *Long-Run Impacts of School Desegregation & School Quality on Adult Attainments*, National Bureau of Economic Research Working Paper 16664 (Jan. 2011) 35 (study of over 8,000 people born between 1945 and 1968, tracked through 2011, which concluded that "school desegregation significantly increased educational attainment among blacks exposed to desegregation during their school-age years, with impacts found on the likelihood of graduating from high school, completed years of schooling, attending college, graduating with a 4-year college degree, and college quality").

In light of the standing and Rule 60(b)(4) obstacles to our review, however, I would leave to another day—a day that is very unlikely to ever arrive—the issues concerning the scope of the district court's equitable power to address concerns about desegregation in this proceeding.